Kenneth S. Kasdan, SBN 71427
kkasdan@kasdancdlaw.com
Graham B. LippSmith, SBN 221984
glippsmith@klwtlaw.com
Jaclyn L. Anderson, SBN 258609
janderson@klwtlaw.com
**KASDAN LIPPSMITH WEBER TURNER LLP**
500 S. Grand Ave., Suite 1310
Los Angeles, California 90071
Tel: 213-254-4800
Fax: 213-254-4801

Jeffrey D. Kaliel, SBN 238293
jkaliel@tzlegal.com
**TYCKO & ZAVAREEI LLP**
1828 L Street NW, Suite 1000
Washington, DC 20036
Tel: 202-973-0900
Fax: 202-973-0950

Manuel S. Hiraldo, *Pro Hac Vice*
mhiraldo@hiraldolaw.com
**HIRALDO P.A.**
401 E. Las Olas Blvd., Suite 1400
Fort Lauderdale, FL 33301
Tel: 954-400-4713

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GEORGE W. WOOLLEY, TAMMY S. WOOLLEY, MICHAEL G. PEKEL, ANTHONY LOOK, JR., KIMBERLY LOOK, GRACHIAN L. SMITH, MARY J. LOUDENSLAGER-SMITH, ALEJANDRO MARCEY, and FELICIA MARCEY, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>YGRENE ENERGY FUND, INC.; YGRENE ENERGY FUND FLORIDA, LLC; and DOES 1 through 10, inclusive,<br><br>          Defendants. | Case No.: 3:17-cv-01258-LB<br><br>**SECOND AMENDED<br>CLASS ACTION COMPLAINT**<br><br>1. **VIOLATION OF THE "UNFAIR" PRONG OF CAL. BUS. & PROF. CODE § 17200, *et seq.* AGAINST YGRENE ENERGY FUND, INC.;**<br>2. **VIOLATION OF THE "FRAUDULENT" PRONG OF CAL. BUS. & PROF. CODE § 17200, *et seq.* AGAINST YGRENE ENERGY FUND, INC.;**<br>3. **VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT;**<br>4. **TORTIOUS INTERFERENCE WITH CONTRACT;**<br>5. **FRAUDULENT INDUCEMENT;**<br>6. **NEGLIGENT MISREPRESENTATION;**<br>7. **UNJUST ENRICHMENT; and**<br>8. **NEGLIGENCE.**<br><br>**DEMAND FOR JURY TRIAL** |

## SECOND AMENDED COMPLAINT FOR DAMAGES

Plaintiffs, George W. Woolley, Tammy S. Woolley, Michael G. Pekel, Anthony Look, Jr., Kimberly Look, Grachian L. Smith, Mary J. Loudenslager-Smith, Alejandro Marcey, and Felicia Marcey, individually and on behalf of all others similarly situated, hereby sue Ygrene Energy Fund, Inc. and Ygrene Energy Fund Florida, LLC ("Ygrene" or "Defendants"), and state and allege as follows on information and belief:

### THE PARTIES

1. Plaintiff, George W. Woolley, is a resident of Broward County, Florida.

2. Plaintiff, Tammy S. Woolley, is a resident of Broward County, Florida.

3. Plaintiff, Michael G. Pekel, is a resident of Miami-Dade County, Florida.

4. Plaintiff, Anthony Look, Jr., is a resident of Sacramento County, California.

5. Plaintiff, Kimberly Look, is a resident of Sacramento County, California.

6. Plaintiff, Grachian L. Smith, is a resident of Broward County, Florida.

7. Plaintiff, Mary J. Loudenslager-Smith, is a resident of Broward County, Florida.

8. Plaintiff, Alejandro Marcey, is a resident of San Diego County, California.

9. Plaintiff, Felicia Marcey, is a resident of San Diego County, California.

10. Defendant, Ygrene Energy Fund, Inc., is a Delaware corporation with headquarters located in Sonoma County, California.

11. Defendant, Ygrene Energy Fund Florida, LLC, is a Florida limited liability company with headquarters in Tampa, Florida.

12. The true names and capacities of Defendants DOES 1 through 10 are unknown to Plaintiffs, and Plaintiffs will seek leave of court to amend this complaint to allege such names and capacities as soon as they are ascertained. Each of the Defendants herein was the agent, joint venturer, or employee of each of the remaining Defendants, and in doing the things hereinafter alleged, each was acting in the course and scope of said agency, employment or joint venture with advance knowledge of, acquiescence in or subsequent ratification of the acts of each and every other remaining defendant. Each of Defendants 1 through 10 is responsible, legally, negligently or in some other actionable manner, for the events and happenings hereinafter

referred to, and caused injuries and damages proximately thereby to Plaintiffs and the Class as hereinafter alleged, either through co-defendants' conduct or through the authorized and/or ratified conduct of its agents, servants or employees or in some other manner.

13.     Ygrene and DOES 1 through 10 are collectively referred to herein as "Defendants."

**JURISDICTION AND VENUE**

14.     Jurisdiction is proper under 28 U.S.C. § 1332(d)(2) because some Plaintiffs reside in a state different from Defendant, and Plaintiffs allege a national class, which will result in at least one class member belonging to a different state than that of Defendants. Plaintiffs seek damages which, when aggregated among a proposed class numbering in the tens of thousands, or more, exceeds the $5,000,000.00 (five-million dollars) threshold for federal court jurisdiction under the Class Action Fairness Act ("CAFA"). Therefore, both the elements of diversity jurisdiction and CAFA jurisdiction are present.

15.     Venue is proper in this Court pursuant to California Code of Civil Procedure section 393 because some portion of the causes of action arose in this County and pursuant to Civil Local Rule 3-2(c) because a substantial part of the events or omissions giving rise to the claims herein alleged occurred in Sonoma County, California. Defendants further provide and market their products and services within this district, thereby establishing sufficient contact to subject them to personal jurisdiction.

16.     At all relevant times, Ygrene Energy Fund, Inc. and Ygrene Energy Fund Florida, LLC were directly engaged in the business of marketing and facilitating PACE loans that are the subject of this Complaint throughout the United States and the State of California.

17.     This Court has personal jurisdiction over Defendants. Facts giving rise to this action occurred in the State of California. Defendants have been afforded due process because they have, at all times relevant to this matter, individually or through their agents, subsidiaries, officers and/or representatives, operated, conducted, engaged in and carried on a business venture in this State, and/or maintained an office or agency in this State, and/or provided services, committed a statutory violation within this State related to the allegations made herein, and

caused injuries to Plaintiffs and Class Members, which arose out of the acts and omissions that occurred in the State of California, during the relevant time period, at which time Defendants were engaged in business activities in the State of California, resulting in injuries to Plaintiffs and Class Members.

## NATURE OF THE ACTION

18.     This lawsuit seeks to protect consumers from (a) Ygrene's deceptive sales practices, in which it enlists ill-trained and self-interested home improvement contractors to sell its Property Assessed Clean Energy ("PACE") loans to homeowners, luring consumers into a major financial obligation without proper disclosures befitting such a momentous commitment; and (b) Ygrene's misrepresentations, non-disclosures, omissions, and fraudulent concealment of material information relating to its PACE loans, including those regarding the likelihood of prepayment and inability to transfer PACE loans, prepayment penalties, fees assessed by Ygrene to avoid such prepayment penalties, and Ygrene's unreasonable and undisclosed payoff statement fees, administrative fees, and/or "Escrow/Custodial Fees" (collectively, "Administrative Fees").

19.     PACE loans are a financing structure by which residential property owners are permitted to opt into a special assessment district to receive financing for energy improvements and retrofits on their homes. The loans are repaid through an annual assessment on the owner's property tax bill. A lien in the amount of the loan is placed on the home. Ygrene aggressively markets PACE loans through various print, Internet, and radio materials, as well as a network of 3,200 home improvement contractors. It provides little and/or inaccurate training to these individuals before they are set loose on unsuspecting consumers.

20.     The training materials Ygrene provides to its improvement contractors contain misleading and incorrect statements about Ygrene's PACE loans that are then passed on to consumers. Such statements include, but are not limited to, the following:

> **Ways that Ygrene's program is superior to other PACE providers. HERO and CalFirst work under an Assessment model** [...] This creates problems for some homeowners when they sell or refinance their homes. Some buyers/lenders are asking that the Assessment be paid off, rather than transferring to the new owner...

**Ygrene's program does NOT use Assessment – Ygrene's model uses Mello-Roos special taxes.** […] Over $20B in Mello-Roos special taxes have been placed on over 1.3M homes over the last 20 years without any problems. None have required payoff at time of sale or refinance. […] Ygrene's pre-payment rate is only 1.2% - Evidence that Ygrene customers are having a positive experience.

21.     Once these contractors receive their Ygrene "certification," the directive from Ygrene is clear: "**BOOST YOUR BOTTOM LINE**."[1]

22.     And this is precisely what this rag-tag group of de facto loan agents set out to do, by routinely misrepresenting the true nature of the PACE loans they sell to consumers so they can maximize their own profits.

23.     Through this sales force, its employees and agents, its marketing, and written disclosures, Ygrene deceives consumers into believing the PACE loan is a risk-free, no-strings-attached program, backed by government support that allows immediate energy efficiency improvements to a home in exchange for nothing more than increased property tax assessments. In reality, the loans are burdensome encumbrances on consumers' homes.

24.     As part of its sales efforts, Ygrene markets its PACE loans as the "smart alternative to traditional credit-based financing,"[2] or in other words, as an alternative to a Home Equity Line of Credit ("HELOC").  According to Ygrene, its PACE loans are a "smart alternative" to traditional loan products because their loans are actually tax assessments that transfer with the property to the next owner of the home—meaning a property owner can leave the loan behind when he/she sells the home, or refinance the home without disturbing the PACE loan. Necessarily, then, these representations indicate to reasonable consumers that prepayment penalties are not charged at the time of sale or refinance—because the PACE loan remains undisturbed.

25.     Ygrene is at pains to distinguish its PACE loans from credit vehicles assigned to a

---

[1]https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0ahUKEwjk8O vH1aPSAhXL8CYKHR0jDTkQFgg0MAE&url=https%3A%2F%2Fygreneworks.com%2Fwp-content%2Fuploads%2F40004-CA-8-15_prf51.pdf&usg=AFQjCNG6WiO-ZMmBy88YrSihwC_TS3E9KQ; (last accessed on February 22, 2017).

[2] https://ygreneworks.com/homeowners/; (last accessed on February 15, 2017).

specific borrower. In fact, in marketing materials, Ygrene goes so far as to say: **"It's as if your house is borrowing the money."** Again, in such a circumstance, no prepayment penalty would ensue.

26.     Contrary to Ygrene's misrepresentations, however, the PACE loans it markets to consumers do **not** travel with the home—in fact, they make it impossible or nearly impossible for consumers to sell their homes without first paying off the loan and incurring a large prepayment penalty. This is because conventional lenders refuse to provide loans on properties encumbered by Ygrene's PACE loans, which benefit from superpriority status.

27.     In other words, Ygrene's PACE loans are not an encumbrance that run with the property; they are an encumbrance that acts exactly like a HELOC.

28.     The misperception that PACE loans run with the property has been actively fostered by Ygrene, and it is widespread. For example, a recent article in the Huffington Post titled *Will PACE Loans Cause the Next Housing Crisis?*, incorrectly stated: "Because the loan is attached to the property, the loan obligations (and any liens) are transferred to any future buyer."[3]

29.     In fact, however, Ygrene's PACE "loan obligations" are *not* transferred to future buyers.  Indeed, rules issued by the federal government make clear this may not occur. At all times relevant, Ygrene was fully aware that the Federal Housing Finance Agency ("FHFA"), on at least three occasions since 2010, "has made clear that…Fannie Mae and Freddie Mac should neither purchase nor refinance mortgages with PACE loans attached."[4]

30.     The FHFA's directive to Fannie Mae and Freddie Mac is crucial because conventional lenders and the housing market act in concert with the FHFA's PACE financing prohibitions since virtually all lenders rely on Fannie Mae and Freddie Mac to purchase the loans that they make to borrowers. This means that individuals looking to purchase a home encumbered by a PACE lien will effectively not be able to secure conventional financing for the purchase unless the homeowners first pay off the PACE loan in its entirety—*and* pay a massive

_____

[3] http://www.huffingtonpost.com/entry/will-pace-loans-cause-the-next-housing-crisis_us_589db386e4b0e172783a9ae9; (February 12, 2017).

[4] http://www.fhfa.gov/Media/PublicAffairs/Pages/Pollard-Statement-before-California-Legislature-Keeping-Up-with-PACE.aspx; (last accessed on January 30, 2017).

**SECOND AMENDED CLASS ACTION COMPLAINT**

1   prepayment penalty to Ygrene, as well as various unreasonable and undisclosed Administrative

2   Fees.

3        31.     Indeed, satisfaction of Ygrene's PACE loans is certain at the time of sale or

4   refinance because no conventional lender will agree to a loan on a property encumbered by a

5   superpriority lien.

6        32.     Ygrene not only misrepresents the *certainty* of a pay-off in both its representations

7   and disclosures, but it also misrepresents the huge financial *impact* of being forced to pay off a

8   PACE loan early.

9        33.     Against this backdrop of deceptive marketing, Ygrene also issues deceptive,

10   misleading, and incomplete written disclosures.  As discussed herein, those disclosures mislead

11   consumers regarding: (1) the necessity of paying off PACE loans at sale or refinancing; (2) the

12   necessity of paying large prepayment penalties at sale or refinancing; (3) the misrepresentation

13   of  various Administrative Fees and payoff statement fees associated with sale or refinancing,

14   which are in actuality not fees for administration, but profits centers for Ygrene on certain

15   consumers; and (4) the assessment of "Pre-Payment Waiver Fees" not disclosed at initial stages

16   of the sign-up process.

17        34.     With respect to the "Pre-Payment Waiver Fee," in recent years Ygrene has

18   surreptitiously added that fee to the closing costs of certain consumers. Yet it provides no

19   explanation in the body of loan documents what the "fee" is attributable to, or what it covers.

20   Upon information and belief, the fee is a belated, halfhearted attempt by Ygrene to acknowledge

21   what FHFA has made clear all along: full satisfaction of the loan is required at sale or refinance,

22   and a prepayment penalty will certainly be charged at that time. Rather than remove the

23   prepayment penalty, which its loan documents and marketing materials continue to represent as a

24   near-impossibility, Ygrene has added this new fee to allow homeowners to avoid paying a

25   prepayment penalty that Ygrene's marketing representations and loan documents indicated would

26   never be charged in the first place. In other words, the fee allows Ygrene to profit further from its

27   own misrepresentations. Worse, and as occurred with Plaintiffs, Grachian L. Smith, Mary J.

28   Loudenslager-Smith, Ygrene foists the fee onto consumers only at the last minute, when previous

**SECOND AMENDED CLASS ACTION COMPLAINT**

1    iterations of loan cost documents did not include the fee.

2        35.    Consumers like Plaintiffs would not have obtained PACE loans had they known

3    the loans would require a prepayment penalty and full satisfaction of the loan at the time of sale

4    or refinance. Moreover, reasonable consumers would not have knowingly agreed to enter into the

5    loans with a Pre-Payment Waiver Fee, when marketing materials and sales practices indicated to

6    them that a prepayment was impossible or unlikely to occur.

7        36.    Since the filing of this lawsuit, Senators Tom Cotton (R-Arkansas), Marco Rubio

8    (R-Florida), and John Boozman (R-Arkansas) have introduced the Protect Americans from Credit

9    Exploitation Act (PACE Act).  The Act "requires disclosure for Property Assessed Clean Energy

10   (PACE) loans that target low-income and elderly Americans with predatory home loans."[5]

11       37.    As Senator Cotton observed:

12            Residential PACE loans are a scam. Predatory green-energy lenders
             are changing state and local laws to trick seniors into taking out
13            high-interest rate loans for 20 years, along with liens on their homes,
             for technology that could be obsolete in a few years. Today, these
14            loans are exempt from the same disclosure forms required for other
             home loans. Our bill will fix this. Requiring disclosure will reduce
15            the advantage that PACE loan sharks have over hard-working
             Americans. It's just the accountability we need.
16

17       38.    This action is based upon a common nucleus of operative facts. All of Ygrene's

18   unfair, deceptive and wrongful conduct in this case arise directly from the material omissions and

19   deceptive representations made directly by Ygrene and its agents to Plaintiffs and members of the

20   class, as well as documents prepared and provided by Ygrene to Plaintiffs and members of the

21   class.

22       39.    As a result of Ygrene's intentional misconduct, Plaintiffs and members of the class

23   ask this Court to award injunctive relief, damages, including damages which flow naturally from

24   the requested injunctive relief, and attorney's fees against Ygrene.

25                      **GENERAL FACTUAL ALLEGATIONS**

26                              **PACE Loans**

27       40.    PACE loans are a financing structure by which residential property owners are

28

---

[5] https://www.cotton.senate.gov/?p=press_release&id=653; (last accessed on May 10, 2017).

**SECOND AMENDED CLASS ACTION COMPLAINT**

permitted to opt into a special assessment district to receive financing for energy improvements and retrofits on their homes. The loans are repaid through an annual assessment on the property owner's property tax bill.

41.     PACE loans range in size from $5,000 to more than $100,000, with an average of approximately $25,000, and charge interest rates of 7% to 10% over a repayment period of five to 25 years.

42.     Municipal revenue bonds secured by liens on participating properties are the primary financing instrument for PACE programs. PACE bonds can be issued either through a private placement or public issuance. The proceeds from the bonds provide funding for home improvement projects that meet program terms and conditions.

43.     PACE loans first originated in California in 2008 with great momentum, but slowed in 2010 due to concerns raised by the FHFA, Fannie Mae, and Freddie Mac regarding the seniority of the PACE lien over mortgages.

44.     In Florida, legal challenges to several PACE bond validation proceedings initially slowed the implementation of PACE lending. However, in a recent opinion, the Florida Supreme Court affirmed a circuit court's final judgment validating a special assessment revenue bond to fund PACE loans. *See Florida Bankers Ass'n v. Florida Development Finance Corp.*, 176 So.3d 1258, 1260 (Fla. 2015).

45.     To date, almost **$3.4 billion** worth of PACE loans have been issued around the country.

46.     PACE loans are marketed with deceptive, incomplete information, and are often pitched by construction and remodeling companies with no expertise in consumer finance issues and who Ygrene provides the same deceptive and incomplete information to pass along to the consumer.

47.     In a recent article titled *America's Fastest-Growing Loan Category has Eerie Echoes of Subprime Crisis*, the Wall Street Journal described just a portion of the problem as follows:

> As the loans spread, so do problems that echo the subprime mortgage crisis. Plumbers and repairmen essentially function as

> loan brokers but have scant training and oversight. They often pitch PACE loans to help land contracting jobs and earn referral fees from lenders….Creditworthiness matters little to lenders, because loans are based on the value of a homeowner's property. PACE loans typically require no down payment, and the debt is added to property-tax bills as an assessment.[6]

48.     Typically, private companies such as Ygrene serve as program administrators and intermediaries between the special districts and borrowers. A company such as Ygrene will market to homeowners, prepare loan applications and documents, conduct the "closing" on loans, and facilitate the funding of individual homeowner projects.

49.     Companies like Ygrene market PACE loans to borrowers as a better alternative to private loans such as home equity lines of credit. In reality, however, as Professor Prentiss Cox[7] notes, PACE loans are nothing more than mortgage loans with a different name:

> PACE financing has all the characteristics of a mortgage loan other than the mechanism of billing and payment through property tax. Unlike a public works tax assessment, PACE financing is voluntarily assumed by the homeowner and provides cash to the homeowner for improvements that ultimately will be owned by the homeowner. From the lender's perspective, PACE financing constitutes another lien on the property for purposes of evaluating the value of the home as security in case of default by the homeowner on the mortgage loan.[8]

### The FHFA's Rules Regarding PACE Loans

50.     The FHFA is the federal regulator and conservator of the secondary mortgage market Government Sponsored Enterprises, Fannie Mae and Freddie Mac (GSEs).

51.     GSEs purchase mortgages from loan originators and use them to issue mortgage backed securities. Combined, the GSEs hold more than $5 trillion worth of mortgages; over half of the Nation's single-family mortgage debt.

52.     Because of their market dominance, the GSEs' lending policies carry significant weight and are closely followed by mortgage loan originators. This is because originators rely on

---

[6] https://www.yahoo.com/news/america-fastest-growing-loan-category-063033906.html; (last accessed on January 30, 2017).
[7] Prentiss Cox is a professor at the University of Minnesota Law School.
[8] Prentiss Cox, *Keeping Pace?: The Case Against Property Assessed Clean Energy Financing Programs,* 83 Col. L. REV. 106 (2011).

**SECOND AMENDED CLASS ACTION COMPLAINT**

the GSEs to purchase the loans that the originators have made to borrowers.

53.   Consequently, the "housing market has acted in concert with the Federal Housing Finance Agency's PACE financing prohibitions for Fannie Mae and Freddie Mac."[9]

54.   On July 6, 2010, FHFA issued its first statement and position on PACE loans. The FHFA expressed grave concerns about PACE loans, stating that such loans

> … present significant safety and soundness concerns that must be addressed by Fannie Mae, Freddie Mac and the Federal Home Loan Banks… First liens established by PACE loans are unlike routine tax assessments and pose unusual and difficult risk management challenges for lenders, servicers and mortgage securities investors. The size and duration of PACE loans exceed typical local tax programs and do not have the traditional community benefits associated with taxing initiatives.
>
> *                               *                               *
>
> FHFA urged state and local governments to reconsider these programs and continues to call for a pause in such programs so concerns can be addressed. First liens for such loans represent a key alteration of traditional mortgage lending practice. They present significant risk to lenders and secondary market entities, may alter valuations for mortgage-backed securities and are not essential for successful programs to spur energy conservation.[10]

55.   On August 31, 2010, Freddie Mac and Fannie Mae each issued letters to lenders stating that the Enterprises would cease purchasing mortgage loans secured by a property with an outstanding PACE loan, originating on or after July 6, 2010, with first-lien priority. Additionally, the GSEs stated that in order to refinance a PACE-encumbered property, owners must pay off the entire outstanding PACE loan.

56.   On February 28, 2011, the FHFA sent a letter to the GSEs' general counsels invoking its statutory authority as conservator under 12 U.S.C. § 4617, as well as its duty to preserve and conserve the GSEs' assets, and directed the GSEs to "continue to refrain from purchasing mortgage loans secured by properties with outstanding first-lien PACE obligations

---

[9] http://mba.informz.net/MBA/data/images/MBA Summary of FHA PACE Bulletin Final.pdf; (last accessed on January 31, 2017).

[10] http://www.fhfa.gov/Media/PublicAffairs/Pages/FHFA-Statement-on-Certain-Energy-Retrofit-Loan-Programs.aspx; (last accessed on January 30, 2017).

**SECOND AMENDED CLASS ACTION COMPLAINT**

1    and carefully monitor through their seller-servicers any programs that create such first-lien

2    obligations."

3         57.    On March 19, 2013, the Ninth Circuit Court of Appeals vacated a district court

4    order and dismissed a lawsuit brought by several California counties and cities which sought to

5    challenge the FHFA's directive to the GSEs, holding that "FHFA's decision to cease purchasing

6    mortgages on PACE-encumbered properties is a lawful exercise of its statutory authority as

7    conservator of the Enterprises." *County of Sonoma v. Federal Housing Finance Agency*, 710 F.3d

8    987, 988 (9th Cir. 2013).

9         58.    On December 22, 2014, the FHFA issued a second statement regarding PACE

10   loans:

> In issuing this statement, FHFA wants to make clear to homeowners,
> lenders, other financial institutions, state officials, and the public
> that Fannie Mae and Freddie Mac's policies prohibit the purchase of
> a mortgage where the property has a first-lien PACE loan attached
> to it. This restriction has two potential implications for
> borrowers. First, a homeowner with a first-lien PACE loan cannot
> refinance their existing mortgage with a Fannie Mae or Freddie Mac
> mortgage. Second, anyone wanting to buy a home that already has a
> first-lien PACE loan cannot use a Fannie Mae or Freddie Mac loan
> for the purchase. These restrictions may reduce the marketability of
> the house or require the homeowner to pay off the PACE loan before
> selling the house.[11]

18        59.    On June 9, 2016, Alfred M. Pollard, General Counsel for the FHFA, once again

19   reiterated the FHFA's directive that "Fannie Mae and Freddie Mac should neither purchase nor

20   refinance mortgages with PACE loans attached." Mr. Pollard further stated:

> [A] PACE lien often represents a retroactive creation of liability on
> a property ahead of the existing first-lien mortgage, which the
> mortgage holder neither knows about nor consents to. The creation
> of a super-lien thus transfers the risk of loss to the first-lien mortgage
> holder after the lender has already underwritten and entered into a
> financing arrangement that facilitates the purchase or refinancing of
> a home. The lender has no knowledge and no say in the subsequent
> additional risk and the potential decline in the value of their

---

[11] http://www.fhfa.gov/Media/PublicAffairs/Pages/Statement-of-the-Federal-Housing-Finance-Agency-on-Certain-Super-Priority-Liens.aspx; (last accessed on January 30, 2017).

**SECOND AMENDED CLASS ACTION COMPLAINT**

collateral by the layering of debt.[12]

60.     Upon information and belief, at all times relevant, Ygrene had knowledge of the above statements and the FHFA's rules that directly impact Ygrene borrowers' ability to sell their homes.

61.     As a result of FHFA's position regarding Ygrene's PACE loans, Ygrene was on notice that Ygrene's consumers are certain to be forced to satisfy their PACE loans before being able to sell their homes.

### PACE Loans in California

62.     As a result of the FHFA's position, PACE loan borrowers have been unable to sell their homes without first satisfying their PACE loans.

63.     In 2008, California passed the first legislation in the country permitting PACE lending. Since that time, over 70,000 homeowners have borrowed money through companies such as Ygrene.

64.     After years of PACE lending in California, homeowners who are now attempting to sell their homes are experiencing first-hand the realities of PACE loans issued by companies such as Ygrene.

65.     On October 19, 2015, a Reuters article titled *Green Financing has Hobbled Home Sales in California* reported that "a growing number of homeowners, lenders and realtors in California suggest the financing is making homes more difficult to sell and disrupting the mortgage market."[13] The article went on to discuss the realities faced by homeowners and how they were ultimately forced to prepay their PACE loans before they could sell their homes.

66.     On November 6, 2015, The Wall Street Journal published an article titled *Clean-Energy Loans Make for Messy Home Sales*, which discussed the lack of disclosures and difficulties faced by PACE loan borrowers attempting to refinance or sell their homes.[14]

---

[12] http://www.fhfa.gov/Media/PublicAffairs/Pages/Pollard-Statement-before-California-Legislature-Keeping-Up-with-PACE.aspx; (last accessed on January 30, 2017).
[13] http://mobile.reuters.com/article/idUSKCN0SD0DP20151019; (last accessed on July 20, 2016).
[14] http://www.wsj.com/articles/clean-energy-loans-make-for-messy-home-sales-1446853426; (last accessed on July 20, 2016).

**SECOND AMENDED CLASS ACTION COMPLAINT**

67.     On April 25, 2016, U.S. Congressman Brad Sherman wrote a letter to the Director of the Consumer Financial Protection Bureau, requesting that the CFPB commence "a proper investigation and examination of potential consumer abuses associated with PACE loans." In his letter, Congressman Sherman noted the various pitfalls consumers have experienced in California, including the fact that "the Federal Housing Finance Agency does not accept purchases of loans with priority lien status attached to it, limiting the consumer's ability to receive refinancing or eventually sell the property unless the PACE loan is paid off in its entirety." [15]

68.     On June 25, 2016, the Daily Democrat published a story by California Assembly Member Matt Dababneh titled *Cost of Going Green Must not be Hidden From Homeowner*, which described the consequences of the unregulated PACE lending market in California:

> There is no requirement for basic disclosures, and homeowners are often led to believe PACE is a subsidized government program that carries no risk if they need to sell or refinance their homes…The prospect of going green, coupled with a misleading sales pitch, is leading homeowners, many of them seniors, to get scammed and become victims of predatory lending because they have no idea what financial product they are really buying. Homeowners are also often unaware that a PACE loan adds a lien to their property, which means they might not be able to sell or refinance their homes if the PACE loans aren't paid off.[16]

69.     Most recently, on July 19, 2016, Pete Mills, Senior Vice President of Residential Policy and Member Engagement for the Mortgage Bankers Association, issued the following statement regarding the MBA's position on PACE loans:

---

[15] http://www.cuna.org/Legislative-And-Regulatory-Advocacy/Removing-Barriers-Blog/Removing-Barriers-Blog/Rep--Sherman-Requests-CFPB-Review-of-Property-Tax-Assessed-Clean-Energy-(PACE)-programs/; (last accessed on July 20, 2016).
[16] http://www.dailydemocrat.com/article/NI/20160625/LOCAL1/160629921; (last accessed on July 20, 2016).

**SECOND AMENDED CLASS ACTION COMPLAINT**

> MBA and its members believe that energy efficient home improvements provide homeowners with a wide variety of benefits, and want to help homeowners safely and sustainably finance these kinds of improvements. However, we are concerned that this program, as designed, would leave low and moderate income FHA borrowers more vulnerable to being misled and steered into financial obligations that they may not fully understand due to lack of disclosure.[17]

70.     The consequences that borrowers in California have faced in being unable to sell their homes were, at all times relevant, known to Ygrene. Notwithstanding the damages Ygrene has caused to thousands of consumers in California, Ygrene continues to engage in these deceptive practices.

## PACE Loans in Florida

71.     On April 30, 2010, the Florida Legislature passed Florida Statute section 163.08 (the "Act") which (1) authorizes local governments to levy non-ad valorem assessments to fund qualifying energy conservation and efficiency, renewable energy and wind resistance improvements to real property; (2) authorizes property owners to apply for funding and voluntarily enter into financing agreements with local governments to finance a qualifying improvement; and (3) authorizes local governments to collect moneys, with specific collection requirements, for such purposes through non-ad valorem assessments.

72.     Under the Act, local governments are permitted to incur debt and partner with other local governments to provide financing to property owners for qualifying improvements.

73.     In order to qualify for a PACE loan in Florida, a property owner must be current on his or her property taxes, as well as his or her mortgage payments, cannot have involuntary liens on the property, and cannot have recorded property-based debt delinquency. § 163.08(9), Fla. Stat.

74.     PACE loans give no consideration to the existing loan-to-ratio value. § 168.08(12)(a), Fla. Stat. A property owner may borrow up to 20% of the just valuation of his or her property without any statutory regard for whether the property owner has equivalent equity in

---

[17] https://www.mba.org/2016-press-releases/july/mba-statement-on-pace-program; (last accessed on July 20, 2016).

**SECOND AMENDED CLASS ACTION COMPLAINT**

the property. § 163.08(12)(a), Fla. Stat.

75.     Furthermore, the purchase money mortgagee cannot protect against diminution in its collateral value by accelerating its loan because the Act prohibits such acceleration if the acceleration is done solely as a result of the property owner obtaining a PACE loan. § 163.08(13), Fla. Stat.

76.     There is no Florida PACE administrator because there is no state program. All of the PACE programs within Florida are formed "by local governments to operate for local governments" and operate pursuant to F.S. §163.01 interlocal agreements, with the exception of St. Lucie and Leon counties, which operate within their own counties.

77.     All PACE programs in Florida are operated by a third-party administrator such as Ygrene. There are presently five (5) PACE programs operating in Florida. Ygrene serves as the administrator for two (2) of the programs and has facilitated funding for 90% of all PACE projects in Florida.

78.     The largest program administered by Ygrene is The Green Corridor District, which consists of 20 local governments in Miami-Dade and Broward Counties. The Green Corridor District includes both residential and commercial properties. The Green Corridor District has authorized $500,000,000.00 of revenue bonds to fund the program. Since its inception, the program has financed approximately $129 million in qualifying improvements. The majority of these improvements have been to residential property with an average residential project size of $22,000.00.

**Ygrene's Business Model**

79.     Ygrene is the nation's leading, multi-state provider of residential and commercial property assessed clean energy financing. Nationwide, Ygrene has approved more than $1 billion in applications and has completed over $394 million in contracts.

80.     Ygrene's PACE loans are no different than private loans except that the terms are less favorable when compared to conventional loans, and instead of a monthly billing statement, borrowers receive an annual tax assessment.

81.     Ygrene acts as a lender by using private capital to provide financing to property

**SECOND AMENDED CLASS ACTION COMPLAINT**

1   owners in the PACE districts it administers. Ygrene's capital sources and structure include a $100

2   million revolving line of credit for the initial funding of PACE loans.

3       82.     Funding for a specific project is accomplished by the special PACE district's (e.g.

4   The Green Corridor) issuing revenue bonds secured by special tax liens. The revenue bond is

5   used as the financial instrument to allow the flow of private capital from Ygrene to home

6   improvement projects. As part of the agreement between the district and Ygrene, the district sells

7   and assigns all of its rights to receive the special tax revenues to Ygrene.

8       83.     More specifically, the district issues a revenue bond to fund the PACE program.

9   The bond is privately placed with Ygrene and issued as a single drawdown bond. Ygrene funds

10  the purchase price of the bond by making advances. Each advance is considered a "sub-series

11  bond" of the drawdown bond.

12      84.     The drawdown bond is in the form of a revolving line of credit, allowing for the

13  repayments of amounts drawn and the re-borrowing of such repaid amounts. Each advance is

14  secured by a Financing Agreement and a senior priority assessment lien on the property.

15      85.     Each individual property owner within the district desiring to finance an energy

16  improvement enters into a Financing Agreement with the district under which the property owner

17  agrees to the district's imposition of a non-ad valorem assessment on the property.

18      86.     Each sub-series bond is secured solely by its own collateral, consisting of the

19  Financing Agreement (evidencing the assessment lien) and a revenue account.

20      87.     When it holds a sufficient amount of sub-series bonds, Ygrene securitizes the

21  bonds and sells them to private investors. In other words, the loans made to property owners are

22  bundled and sold to investors with a transfer of rights to the PACE loan revenue stream as a

23  security.

24      88.     On July 23, 2015, Ygrene announced the completion of a **$150 million** private

25  securitization transaction. The transaction combined both residential and commercial asset

26  revenue streams, combined projects in all of the states where Ygrene operates, and included both

27  special taxes and assessments in a single securitization.

28      89.     On November 15, 2016, Ygrene announced the completion of another bond in the

1    amount of **$184 million**.

2           90.    Most recently, on April 24, 2017, Ygrene announced the completion of another

3    bond in the amount of **$176 million**.

4           91.    In order to maximize profits for itself and its investors, Ygrene offers loan terms

5    that are much less favorable than conventional loan products overall.

6           92.    Ygrene offers its borrowers repayment terms of 5, 10, or 20 years. In the event of

7    prepayment, Ygrene charges borrowers a fee of 3% to 5% of the remaining balance of the loan.

8           93.    The prepayment penalty that Ygrene charges consumers is for its own benefit and

9    to make its bonds more attractive to investors, who prefer loans with pre-payment penalties

10   because these penalties reduce the speed at which loans are repaid, allowing the investors to earn

11   the full potential of their investment.

12          94.    On average, Ygrene charges $4,000.00[18] in various fees, including an application

13   fee; processing and underwriting fee; miscellaneous county costs; record and disbursement fees;

14   escrow and title insurance; a closing fee; capitalized interest, and, in some instances, a pre-

15   payment waiver fee.

16          95.    Ygrene also charges borrowers excessive interest rates of 7% to 12%, which is

17   considerably higher than a standard equity line of credit, which have averaged between 4% and

18   5% over the past five (5) years.  As recently observed by the Director of the FHFA during a

19   Congressional oversight hearing on PACE loans: "There is no rational reason, if you think about

20   it, why a superior tax lien would be having an interest rate of 10, 11, or 12 percent when a lien

21   subordinate to it is going at 4 percent or 5 percent."

22          96.    With the exception of the application fee, all fees are included in the loan and are

23   subtracted from the disbursement amount at the time of closing.

24          97.    In addition to supplying private capital, Ygrene is also responsible for managing

25   the PACE program district, establishing a budget, and funding program operations.

26          98.    As part of its services, Ygrene provides program design, marketing, administrative

27   duties, origination, application processing, and ongoing reporting services.

---

[18] Based on a $35,000.00 principal loan at 20 years.

**SECOND AMENDED CLASS ACTION COMPLAINT**

99.     Marketing the program includes multiple modes of advertisement, including web-based, mail campaigns, television, radio and print ads, and outreach to the building and installation community, including training materials. Additionally, educational seminars are conducted for County residents.

100.     Most importantly, Ygrene is solely responsible for developing loan documents and disclosures that are provided to consumers.

### Ygrene's Deceptive Business Practices Have Damaged Consumers

101.     Ygrene uses a network of over 3,200 home contractors to drum up business.

102.     These contractors act as de facto mortgage brokers and are often the primary point of contact between Ygrene and its borrowers.

103.     Ygrene provides little and inaccurate training to these contractors, whose primary incentive it is to sign up additional homeowners, collect Ygrene's referral fee for doing so, and ultimately charge unusually high costs for the energy-efficiency improvement work. The result is unregulated lending with unqualified and self-interested contractors acting as mortgage brokers.

104.     These de facto loan agents routinely and systematically misrepresent the characteristics of Ygrene PACE loans, often under Ygrene's instruction and based on Ygrene's misinformation.

105.     Through its deceptive marketing, Ygrene leads consumers to believe that its PACE loans are a government subsidized program that carries no risk if they need to sell their homes or refinance a mortgage.

106.     Numerous consumers have complained about these sales practices. For example, California consumers who were deceived by Ygrene have taken to the Internet to voice their complaints:

-     I just found out that i cannot refinance my house because i have one ygrene loan on my property tax.

-     They lied about passing the unpaid balance onto the new owners as no lender will approve a loan with a lien of this type on it. The lien would be in first position over a bank lien. They never disclosed the prepayment penalty fee, escrow fees, payoff figure fee or statement fee.

- They will tell you things like, "the loan will stay with the home because it goes under the property taxes. And if you sell the home, the lien just goes to the new homeowner cause it doesn't need to be disclosed." Wrong, they will find out about the lien once a title company pulls the records on it. That's a great selling point to get a lot of people. This is how we were pitched. Also, we found out through our current loan process you will not be able to refinance your mortgage if you are getting a FreddieMac or FannieMae (they probably back at least 50% of the nations loans) backed loan without paying off the Ygrene/Pace "Special Tax Lien" first. It States, "Thus, in order to refinance your home loan, or for a prospective purchaser of your property to obtain a loan secured by the property, you MAY need to remove the special tax lien by prepaying the special-tax obligation in full." Why even say MAY because it absolutely has to be paid in full. I've talked with a lot of brokers and they have assured me of this. But they won't tell you this upfront. ABSOLUTELY, NONE OF THIS WAS DISCLOSED UPFRONT.

- Stay away from this financing! They told us we could refinance our home, but failed to tell us that no mortgage company would touch us after our lien was in place. You have to pay off the lien before you can refinance. Their sales people have no clue what position they put the homeowners in and don't care. This program puts the government in first position on your property and you have no recourse. This is predatory lending at its best, backed by the government. Don't do this, otherwise you are locked into your property with thousands due the city or county every year. Unless you like losing your equity for 20 years and no possible way of refinance for the same duration, then this program is for you. Don't make the same mistake we did. Hold out for a conventional loan; at least you will get better payment options and can sell your house easily that way with no government intervention. Good luck.

- They lied about passing the unpaid balance onto the new owners as no lender will approve a loan with a lien of this type on it. The lien would be in first position over a bank lien. They never disclosed the prepayment penalty fee, escrow fees, payoff figure fee or statement fee.
- They also put a lien against your title. Cannot sell the house without paying them off. Their website has wrong information on it - They say the loan doesn't stay with the house - it has to be paid off when you refi or sell. So much for the loan stays with house BS. Stay away from this organization.

- Do not use this financing option, or, only use it if you know you will not want to move or refinance within the time period of your

20

**SECOND AMENDED CLASS ACTION COMPLAINT**

loan. Ygrene LIENS your property (or rather their financial partner Willdan will do it) and if you want to sell or refinance, chances are your title company will want the liens cleared up before you do anything! So... savings? Not so much. If you try to tell the Ygrene folks that liens are not the same as Mello Roos, they argue with you. For me, it basically came down to their rep telling me that it was my title companies fault for not accepting the liens on the property. I am so sorry that I went this route and I will tell everyone I know NOT to work with this company. Oh yeah, forgot to mention that everytime you sign a contract, they place a lien on the property for the ENTIRE amount your property qualified for, not just the taxes on the amount you used. They placed 3 liens my house for over $15,000, for 2 projects worth $25,000. A small part of me wonders if this isn't part of their plan all along!

- The roofing company that did the work on our house was good, however Ygrene puts a lien on your home. We are refinancing our house and the lien is a real problem - it needs to be paid off in full (fine, we will use some home equity for that). [19]

- It was too good to be true. We did decide to sell nearly a year later. That was not supposed to be a problem. Our rep had assured us that this was transferable. Because the loan was tied to the tax payments, the new owners would be able to assume that obligation. We were assured it was transferable. From a theoretical standpoint, I'm sure it is. You simply have to get the buyers and the buyer's lender to agree to finance the house with a lien attached. Here is a problem; no lender will finance a home that has a lien attached. None. Zilch. Zip. Nada. Lenders will not fund a mortgage for a property that has a lien on it. If you think you might sell or refinance the house before the lien is paid for, and you have a Ygrene lien, be prepared to pay off the lien as a part of the sales price. Also enjoy the fact that the interest is fully put into the cost of the project and you will pay off the principal and FULL interest for the entire length of the contract.  Fun… [20]

107.    These unlicensed contractors use marketing materials and talking points prepared in a uniform fashion by Ygrene. Ygrene fails to adequately supervise its broad network of contractor-loan officers.

108.    Ygrene markets the *lack* of consumer disclosures as part of its sales pitch to

[19] http://www.yelp.com/biz/ygrene-energy-fund-santa-rosa; (last accessed on January 31, 2017).
[20] https://www.yelp.com/biz/ygrene-energy-fund-sacramento; (last accessed on January 31, 2017).

**SECOND AMENDED CLASS ACTION COMPLAINT**

contractors interested in becoming a Ygrene "certified" contractor:

> 15 Minute Approvals    Whether you're applying online or sitting onsite with property owner, we can provide underwriting decision and finance documents in 15 minutes or less.[21]

109.   The misrepresentations by the de facto loan agents are furthered by deceptive marketing materials designed and distributed by Ygrene, and by verbal misrepresentations that Ygrene employees make to interested consumers.

110.   In marketing its loans to consumers, Ygrene emphasizes its "partnership" with local governments, and states that "thanks to a partnership with your local government," it is able to bring consumers 100% financing for energy improvement projects.

111.   In a promotional video, Ygrene made the following false statements to Plaintiffs and members of the class:

- "If you sell your property, the payments transfer to the new owners just like your property tax.  So you only pay for what you use."

- "It's as if your house is borrowing the money, not you personally.  As a result, we don't need to look at your credit score, verify your employment, or review your financial statements."[22]

112.   Up until the filing of this lawsuit, Ygrene also made the following misrepresentations on its website:

> The project debt does not have to be paid off upon property sale or transfer.[23]

---

[21] www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=2&ved=0ahUKEwjk8OvH1a PSAhXL8CYKHR0jDTkQFgg0MAE&url=https%3A%2F%2Fygreneworks.com%2Fwp-content%2Fuploads%2F40004-CA-8-15_prf51.pdf&usg=AFQjCNG6WiO-ZMmBy88YrSihwC_TS3E9KQ; (last accessed on February 22, 2017).

[22] Defendants have since removed this video from their website.  The video viewed by Plaintiffs, as alleged below, is available at https://www.youtube.com/watch?v=vlzVpTCZB5g; (last accessed on August 21, 2017).  Defendants have replaced the video viewed by Plaintiffs with one that states: "If you sell your property, in some cases, payments may transfer to the new owner.  *See* https://ygreneworks.com/; (last accessed on August 21, 2017).

[23] https://web.archive.org/web/20151024215502/http://ygreneworks.com/faqs; (last accessed on August 21, 2017).

**Payments stay with the property**
If you sell your home, the payments on Ygrene financing can transfer to the new owner – so you only pay for improvements while you use them.[24]

113.   Not surprisingly, and as occurred with Plaintiffs, Ygrene's own employees make similar misrepresentations when speaking with consumers on the telephone or in person, prior to and during the loan origination process.

114.   Upon information and belief, and at all times relevant, Ygrene had corporate policies and procedures pursuant to which it instructed its employees, agents, and certified contractors to misrepresent to consumers the true nature of its PACE loans.  Pursuant to these policies and procedures, Ygrene instructed its employees, agents, and certified contractors to represent to consumers that its PACE loans are always transferable at the time of sale or refinance.

115.   Under these policies and procedures, Ygrene employees, agents, and certified contractors routinely responded to consumer inquiries about the impact on the sale or refinance of a property encumbered by a Ygrene lien by stating that the lien would have no impact whatsoever, and would transfer with the property to the new owner.

116.   In short, Ygrene engaged and continues to engage in a series of calculated misrepresentations and omissions, the sole purpose of which is to deceive and conceal from consumers the true implications and consequences of its PACE loans, particularly with respect to the sale or refinancing of properties encumbered by PACE loans.

117.   Only at the very end of the deception-riddled sales process are consumers presented with written disclosures and Financing Agreements. These disclosures, like Ygrene's marketing, are also deceptive and omit key information, as discussed *infra*.

**Ygrene's Deceptive Written Disclosures**

118.   Ygrene's Unanimous Approval Agreement ("UAA"), used for transactions in California, contains the following language, which further misrepresents the nature of PACE

---

[24] https://web.archive.org/web/20160315093237/https://ygreneworks.com/homeowners; (last accessed on August 23, 2017).

**SECOND AMENDED CLASS ACTION COMPLAINT**

loans by saying only that: (1) "certain" lenders desire to comply with FHFA guidance (when virtually all do); (2) the FHFA "appears to have instructed" lenders not to purchase loans with attached PACE loans (when both the FHFA and other agencies repeatedly stated this fact with certainty); and (3) that in vague "superior lien for qualifying improvements" situations "you may" need to "remove the special-tax lien by prepaying":

> Many banks that make home loans desire to preserve the option to sell those loans to U.S. government-sponsored enterprises (called "GSEs") that are regulated by the Federal Housing Finance Agency ("FHFA"). The FHFA *appears to have instructed* its GSEs not to purchase residential loans where there is a superior lien for qualifying improvements, such as the special-tax lien. Thus, in order to refinance your residential loan, or for a prospective purchaser of your property to obtain a loan secured by the property, you *may* need to remove the special-tax lien *by prepaying the assessment obligation in full*. You thus should consider the likelihood and timing of a possible refinancing or sale of your property, and the costs to prepay the special-tax obligation, in deciding whether to annex your property to the district.

(emphasis added).

119.    Ygrene's confusing disclosure *does not* plainly state that "I understand that I may be required to pay off the remaining balance of this obligation by the mortgage lender refinancing my home." *See* AB 2693 § 6. Instead, Ygrene obfuscated the "disclosure" by including misleading language about what FHFA "appears to have instructed" and complicated statements about the removal of "special-tax liens by prepaying." Nor did Ygrene's "disclosure" state in simple terms that "I understand that … If I sell my home, the buyer of their mortgage lender may require me to pay off the balance of this obligation as a condition of sale." *See* AB 2693 § 6. Indeed, nowhere did Ygrene use the phrases "pay off" or "condition of sale." Thus, Ygrene's "disclosure" does not comport with California's Streets and Highways Code § 5898.17.[25]

---

[25] California's Streets and Highways Code requires the following non-deceptive disclosure before a property owner consummates a voluntary contractual assessment like a PACE loan: "I understand that I may be required to pay off the remaining balance of this obligation by the mortgage lender refinancing my home. If I sell my home, the buyer or the mortgage lender may require me to pay off the balance of this obligation as a condition of sale." *See* Cal. Streets and Highways Code § 5898.17. Unlike phrases like "prepaying the assessment," "special-tax lien(s)" "superior liens" and "qualifying improvements," plain language like "pay off," "require," and

24

120.    In sum, Ygrene's fine print disclosure is at pains to downplay the possibility that the PACE loan could create an obstacle to sale or refinance, and is especially misleading in light of the verbal representations made by Ygrene employees and Ygrene agents that the loan travels with the house.  It was deceptive to state that the "FHFA appears to have instructed" that "prepaying" or a "special tax lien" may need to be "remov(ed)" instead of explaining that borrowers could be "required" to "pay off" the entire balance of the loan obligation to refinance or as a "condition of sale." In reality, FHFA's directive is unequivocal and it was virtually certain the loan would need to be paid off at the time of sale or refinance.

121.    Further, the disclosure omits any reference to a prepayment penalty.  Rather, it indicates that even if an involuntary prepayment is required, consumers will only have to "prepay[] the assessment obligation in full"—but does not disclose that a prepayment penalty *and* additional, unreasonable Administrative Fees will also be assessed.

122.    Only in a *separate section* of the UAA, discussing *voluntary* repayment of the "special tax obligation," does Ygrene mention the possibility of a prepayment penalty and additional fees—and even then it states only that such a premium "may" be assessed:

> The owner may prepay the Special Tax obligation at any time by paying the then outstanding principal balance as shown on the amortization schedule provide with the Final Closing Statement, plus reasonable administrative costs and the current year's installment of the Special Tax that appears on the property tax bill. The prepayment *may* also include a prepayment premium based upon a percentage of the remaining principal as defined in Exhibit B hereto.  The Special Tax obligation may only be repaid in full.

123.    The two separate disclosures reproduced above indicate to reasonable consumers that, at most, a prepayment penalty may apply when a homeowner voluntarily chooses to prepay the loan—but not where he is forced to do so as a "condition of sale" or as a "require[ment]" of refinancing.

124.    In short, Ygrene's UAA never states that a) a homeowner could be required to "pay off" the loan "as a condition of sale" or as a "require[ment]" for refinancing; and b) during a

---

"condition of sale" clearly communicate to consumers that they could have to pay the obligation in full to sell or refinance.

**SECOND AMENDED CLASS ACTION COMPLAINT**

1   sale or refinance the homeowner will also have to pay a prepayment penalty and additional,

2   unreasonable Administrative Fees. Indeed, Ygrene's discussion of lien satisfaction and the

3   prepayment penalty never appear together in the UAA.  That is by design; Ygrene isolates these

4   terms in order to conceal the central fact of these loans: homeowners will almost certainly have to

5   pay a penalty and additional, unreasonable Administrative Fees.

6        125.    Ygrene's Agreement to Pay Assessments and Finance Qualifying Improvements

7   ("Financing Agreement"), used in Florida, contains the following language, which, like the UAA,

8   misrepresents the nature of PACE loans by saying only that: (1) "certain" lenders desire to

9   comply with FHFA guidance (when virtually all do); (2) the FHFA "appears to have instructed"

10  lenders not to purchase loans with attached PACE loans (when both the FHFA and other agencies

11  repeatedly stated this fact with certainty); and (3) that "you may" need to "prepay the assessment

12  obligation" if a homeowner wanted to sell or refinance (when a homeowner is actually at serious

13  risk of having to "pay off" the loan obligation as a "require[ment]" of refinancing or as a

14  "condition of sale"):

> Many lenders that make residential loans desire to preserve the option to sell those loans to U.S. government-sponsored enterprises (called "GSEs") that are regulated by the Federal Housing Finance Agency ("FHFA"). The FHFA appears to have instructed its GSEs not to purchase residential loans where there is a superior lien for qualifying improvements, such as the assessment lien. Thus, in order to refinance your residential loan, or for a prospective purchaser of your property to obtain a loan secured by the property, you *may* need to remove the assessment lien by prepaying the assessment obligation in full. You thus should consider the likelihood and timing of a possible refinancing or sale of your property, and the costs to prepay the assessment obligation, in deciding whether to participate in the program by executing this agreement. A prepayment premium *may* be applied on assessments that are paid early.

24       126.    As with the California disclosure, the Financing Agreement minimizes the

25  possibility that the PACE loan could create an obstacle to any sale, and is especially misleading in

26  light of the verbal representations made by Ygrene employees and Ygrene agents that the loan is a

27  tax that travels with the home.  It was deceptive to state that the "FHFA appears to have

28  instructed" and that an "assessment lien" may need to be "remove(d)" by "pre-payment" instead

of plainly explaining that the consumer could have to "pay off" a PACE loan as a "require[ment]" to refinance or as a "condition of sale." In other words, Ygrene's complicated, winding disclosure conceals the risk that consumers will likely have to "pay off" the obligation to sell or refinance their home to deceive consumers into believing that the PACE loan will not create a barrier to refinance or sale. In reality, it is virtually certain the loan would need to be paid off at the time of sale or refinance.

127.    Like the UAA, the Financing Agreement, states only that a prepayment premium "may" be assessed:

> The Owner may prepay the Final Assessment obligation at any time by paying the then outstanding principal balance as shown on the amortization schedule provided with the final closing statement, plus reasonable administrative costs and the current year's installment of the Assessment that appears on the property tax bill. The prepayment may also include a prepayment premium based upon a percentage of the remaining principal as defined in Exhibit C hereto.  The Final Assessment obligation may only be prepaid in full.

128.    Before making these disclosures, Ygrene was on notice that the Federal Housing Finance Agency ("FHFA"), on at least three occasions since 2010, "has made clear that…Fannie Mae and Freddie Mac should neither purchase nor refinance mortgages with PACE loans attached."[26]

129.    Ygrene did not fully disclose to Plaintiffs and Class Members that the FHFA had unequivocally instructed GSEs not to purchase loans on PACE-lien encumbered properties.

130.    At all times material hereto, Ygrene knew that Plaintiffs' and the Class Members' PACE loans would almost certainly have to be satisfied before a sale of the corresponding property or mortgage refinance could occur.

131.    In some cases, as part of executing the last-minute Financing Agreement, Ygrene adds the Pre-Payment Waiver Fee, without explaining to consumers or providing any written explanation of the fee.

132.    Had Plaintiffs and members of the Class known the truth about Ygrene's PACE

---

[26] http://www.fhfa.gov/Media/PublicAffairs/Pages/Pollard-Statement-before-California-Legislature-Keeping-Up-with-PACE.aspx; (last accessed on July 20, 2016).

27

**SECOND AMENDED CLASS ACTION COMPLAINT**

loans and its Waiver Fee, as well as the additional administrative charges, they would not have entered into these agreements.

### Ygrene's Unreasonable Administrative Fees

133.   Adding insult to injury, for consumers forced to pay off their PACE loan obligations as a result of a sale or refinance, Ygrene assesses additional, unreasonable Administrative Fees.

134.   First, Ygrene requires that homeowners pay a $125 "payoff statement fee," which is not disclosed in the UAA or Financing Agreement and which it is therefore not authorized, by contract or otherwise, to charge.

135.   Second, it requires that homeowners pay a $75 "Administrative Fee," which is not disclosed in the UAA or Financing Agreement, and which it is therefore not authorized, by contract or otherwise, to charge.

136.   Third, it requires that homeowners pay a $55 "Escrow/Custodial Fee," which is not disclosed in the UAA or Financing Agreement, and which it is therefore not authorized, by contract or otherwise, to charge.

137.   Worse, none of these charges is remotely associated with Ygrene's actual costs to produce a payoff statement or to "administer" the payoff—and are *in addition* to the already-excessive prepayment penalty.

138.   Such charges are not adequately disclosed in the UAA or Financing Agreement as an additional necessary consequence of selling or refinancing a home encumbered by a Ygrene loan.  When these fees are finally assessed on consumers, the fee names misrepresent the true purpose and reason for the fees, which are not to cover Ygrene's administrative costs, but are only to pad its profits. As such, the Administrative Fees are not reasonable.

139.   The Administrative Fees are therefore a surprise to consumers when they are assessed.

### Factual Allegations Specific to Plaintiffs

### George W. Woolley and Tammy S. Woolley

140.   Plaintiffs, George Woolley and Tammy Woolley, are a married couple who own their primary residence in Margate, Florida.  Plaintiffs obtained a PACE loan through Ygrene on

or about January 2016.

141.    On or about October 26, 2015, prior to signing the loan agreement, Plaintiff, Tammy S. Woolley, watched a promotional video located on Ygrene's website at https://ygreneworks.com.  In this promotional video, Ygrene made the following misrepresentations to Plaintiff:

- "If you sell your property, the payments transfer to the new owners just like your property tax.  So you only pay for what you use."

- "It's as if your house is borrowing the money, not you personally.  As a result, we don't need to look at your credit score, verify your employment, or review your financial statements."[27]

142.    Plaintiff relied on these statements and would not have entered into the loan if she had known that these statements were false and misleading.

143.    Additionally, on or about October 2015, Plaintiff, Tammy S. Woolley, called Ygrene at the number listed on Ygrene's website.  Plaintiff does not recall the name of the agent with whom she spoke, but does recall the agent was a female.  Plaintiff recalls that the Ygrene employee told Plaintiff that the PACE loan was attached to her property, not directly to her, and that it would be tied to their annual property taxes.  The agent also told Plaintiff that if she decided to sell the property at any point, the loan would be transferred to the new property owner.

144.    Plaintiff relied on these statements and would not have entered into the loan if she had known that these statements were false and misleading.

145.    Additionally, Ygrene required that Plaintiffs sign a Financing Agreement, a document created by Ygrene, bearing Ygrene's name and logo, and containing the following deceptive disclosure:

> The FHFA appears to have instructed its GSEs not to purchase residential loans where there is a superior lien for qualifying improvements, such as the assessment lien.  Thus, in order to

---

[27] Defendants have since removed this video from their website.  The video viewed by Plaintiff is available at https://www.youtube.com/watch?v=vlzVpTCZB5g; (last accessed on August 21, 2017).  Defendants have replaced the video viewed by Plaintiff with one that states: "If you sell your property, in some cases, payments may transfer to the new owner."  *See* https://ygreneworks.com/; (last accessed on August 21, 2017).

refinance your residential loan, or for a prospective purchaser of your property to obtain a loan secured by the property, you may need to remove the assessment lien by prepaying the assessment obligation in full….A prepayment premium may be applied on assessments that are paid early.

146.   The documents were sent to Plaintiffs electronically, and Ygrene did not guide Plaintiffs through the documents before they were executed by Plaintiffs.

147.   At no point in time did Ygrene adequately disclose to Plaintiffs they would almost certainly have to "pay off" the PACE loan as a "require[ment]" to refinance or as a "condition of sale." Nor did Ygrene adequately disclose that Plaintiffs would have to pay a prepayment penalty and additional administrative fees.  To the contrary, Ygrene's promotional video and representative assured Plaintiffs that the lien would not have to be satisfied in the event of a sale or refinance.

148.   On or about February 2016, a Ygrene-certified contractor installed a new roof on Plaintiffs' home.

149.   Subsequently, Plaintiffs attempted to refinance their home, but no lender would agree to refinance unless Plaintiffs satisfied the Ygrene lien.

150.   On or about September 2016, after months of attempting to refinance their home, Plaintiffs were forced to satisfy the Ygrene lien at the closing of their loan refinance, including payment of a Redemption Premium (5.00% prepayment penalty), a payoff statement fee, an Administrative Fee, and an Escrow/Custodial Fee.

151.   Based on Ygrene's misrepresentations and omissions, Plaintiffs understood that the Ygrene loan would not need to be satisfied as a requirement to refinance or as a condition of sale.

152.   In obtaining a PACE loan through Ygrene, Plaintiffs relied upon Ygrene's omissions and deceptive representations to their detriment.

153.   Had Plaintiffs known the truth about Ygrene's loan, Plaintiffs would not have entered into an agreement through Ygrene, and would not have agreed to the prepayment penalty. Plaintiffs did not agree, and would not have agreed, to pay any of the associated administrative fees at the time they took the loan.

**Michael G. Pekel**

154.   On or about September 2016, Plaintiff, Michael G. Pekel, purchased a single-family home in Miami-Dade County as an investment property.

155.   The home needed a new roof, so Plaintiff contacted a roofing contractor.

156.   Subsequently, on or about early September 2016, Plaintiff met in person, at his home, with a male representative from Joe Ward Roofing and Energy Solutions, Inc. ("Ward Roofing"), a Ygrene "certified contractor."

157.   The gentleman from Ward Roofing advised Plaintiff of the Ygrene program.  The representative explained the program and that there were no upfront costs.  He further stated that the Ygrene lien would be paid with the property's taxes.  Plaintiff expressly noted to the representative that he would probably be selling the property in the near future.  In response, the representative told Plaintiff not to worry because the Ygrene lien "*goes with the property*."

158.   Plaintiff relied on these statements and would not have proceeded to pursue the loan if he had known that these statements were false and misleading.

159.   A few days later, Plaintiff visited Ygrene's website (https://ygreneworks.com) to learn about the program and watched Ygrene's promotional video.  In this promotional video, Ygrene made the following misrepresentations to Plaintiff:

- "If you sell your property, the payments transfer to the new owners just like your property tax.  So you only pay for what you use."
- "It's as if your house is borrowing the money, not you personally.  As a result, we don't need to look at your credit score, verify your employment, or review your financial statements."[28]

160.   Subsequently, on or about early October 2016 (shortly prior to entering into the PACE loan), Plaintiff called Ygrene at the telephone number listed on Ygrene's website.  Plaintiff spoke with a female employee of Ygrene, though he does not recall her name.  The employee

---

[28] Defendants have since removed this video from their website.  The video viewed by Plaintiff is available at https://www.youtube.com/watch?v=vlzVpTCZB5g; (last accessed on August 21, 2017).  Defendants have replaced the video viewed by Plaintiff with one that states: "If you sell your property, in some cases, payments may transfer to the new owner."  *See* https://ygreneworks.com/; (last accessed on August 21, 2017).

**SECOND AMENDED CLASS ACTION COMPLAINT**

explained that there would be no upfront costs, no credit or income verification, and that the approval would all be based on the value of the property.  The employee also stated to Plaintiff that the "property is borrowing the money."  The employee further stated – in response to Plaintiff's inquiry about what would happen if he wanted to sell the property – that the Ygrene Loan "*carries with the property.*"

161.   Additionally, Ygrene required that Plaintiff sign a Financing Agreement, a document that was created by Ygrene, bearing Ygrene's name and logo, and containing the following deceptive disclosure:

> The FHFA appears to have instructed its GSEs not to purchase residential loans where there is a superior lien for qualifying improvements, such as the assessment lien. Thus, in order to refinance your residential loan, or for a prospective purchaser of your property to obtain a loan secured by the property, you may need to remove the assessment lien by prepaying the assessment obligation in full….A prepayment premium may be applied on assessments that are paid early.

162.   The documents were sent to Plaintiff electronically, Ygrene did not guide Plaintiff through the documents before they were executed by Plaintiff.

163.   At no point in time did Ygrene adequately disclose to Plaintiff that he would almost certainly have to "pay off" the PACE loan as a "require[ment]" to refinance or as a "condition of sale." To the contrary, Ygrene's certified contractor, promotional video, and representative assured Plaintiff that the lien would not have to be satisfied at the time of sale or refinance.

164.   On or about January 2017, a Ygrene-certified contractor installed a new roof on Plaintiff's property.

165.   Subsequently, Plaintiff attempted to sell the home, but was unable to do so because no buyer could obtain financing with the Ygrene lien attached to the property.

166.   After months of attempting to sell the home, Plaintiff was forced to satisfy the Ygrene lien at closing so that the purchasers' lender would approve financing.

167.   On May 9, 2017, Plaintiff closed escrow on the sale of his property.  Plaintiff was forced to use a portion of the sales price to satisfy Ygrene's lien, including various fees paid to

1  Ygrene including a Redemption Premium (5.00% prepayment penalty), a payoff statement fee, an

2  Administrative Fee, and an Escrow/Custodial Fee.

3     168.   Based on Ygrene's misrepresentations and omissions, Plaintiff understood that the

4  Ygrene loan would transfer to subsequent owners of the property and would not need to be

5  satisfied as a condition of sale or as a requirement to refinance.

6     169.   In obtaining a PACE loan through Ygrene, Plaintiff relied to his detriment upon

7  Ygrene's omissions and deceptive representations.

8     170.   Had Plaintiff known the truth about Ygrene's loan, Plaintiff would not have

9  entered into an agreement through Ygrene, and would not have agreed to the prepayment penalty.

10  Plaintiff did not agree, and would not have agreed, to pay any of the associated administrative

11  fees at the time he took the loan.

12                          **Anthony Look, Jr., and Kimberly Look**

13     171.   Plaintiffs, Anthony Look, Jr. and Kimberly Look ("Look Plaintiffs"), are a

14  married couple who purchased their single-family home in Sacramento County, State of

15  California on or about March 2015.

16     172.   Plaintiffs obtained a PACE loan through Ygrene on or about August 2015 to

17  finance the installation of a patio cover and concrete pad.

18     173.   When Plaintiffs visited Ygrene's website (https://ygreneworks.com) to learn

19  about the program, on or about late July 2015, they watched Ygrene's promotional video. In this

20  promotional video, Ygrene made the following misrepresentations to Plaintiffs:

21          •   "If you sell your property, the payments transfer to the new owners just like

22              your property tax.  So you only pay for what you use."

23          •   "It's as if your house is borrowing the money, not you personally.  As a result,

24              we don't need to look at your credit score, verify your employment, or review

25              your financial statements."[29]

26  ───────────────────
[29] Defendants have since removed this video from their website.  The video viewed by Plaintiff
27  is available at https://www.youtube.com/watch?v=vlzVpTCZB5g; (last accessed on August 21,
    2017).  Defendants have replaced the video viewed by Plaintiff with one that states: "If you sell
28  your property, in some cases, payments may transfer to the new owner."  *See*
    https://ygreneworks.com/; (last accessed on August 21, 2017).

**SECOND AMENDED CLASS ACTION COMPLAINT**

174.    Plaintiffs relied on these statements and would not have proceeded to pursue the loan if they had known that these statements were false and misleading.

175.    Plaintiffs also emailed and spoke with a Ygrene representative, Megan Smith, throughout the process of obtaining their Ygrene loan. Consistent with Ygrene's website and promotional materials, as well as its corporate policies and procedures, Megan Smith stated that Ygrene liens are transferable with the property in the event of a sale or refinance, and that the lien would not have any impact on their ability to sell or refinance the property. Plaintiffs relied on these representations in deciding to finance their home improvement through Ygrene.

176.    Additionally, Ygrene required that Plaintiffs sign a Unanimous Approval Agreement, a document created by Ygrene, bearing Ygrene's name and logo, and containing the following deceptive disclosure:

> The FHFA appears to have instructed its GSEs not to purchase residential loans where there is a superior lien for qualifying improvements, such as the special-tax lien. Thus, in order to refinance your residential loan, or for a prospective purchaser of your property to obtain a loan secured by the property, you may need to remove the special-tax lien by prepaying the assessment obligation in full.

177.    The documents were sent to Plaintiffs electronically, and Ygrene did not guide Plaintiffs through the documents before they were executed by Plaintiffs.

178.    At no point in time did Ygrene adequately disclose to Plaintiffs they would almost certainly have to "pay off" the PACE loan as a "require[ment]" to refinance or as a "condition of sale." To the contrary, Ygrene's representative, Megan Smith, assured Plaintiffs that the lien would not have to be satisfied because of a sale or refinance.

179.    The home improvement work done to Plaintiffs' home with the Ygrene financing was performed by Clark Wagaman Designs, a Ygrene certified contractor. Toney McDonald of Clark Wagaman Designs told Plaintiffs that the company was authorized to do the work with Ygrene financing because he had taken a class provided by Ygrene about its program.

180.    On or about April 2017, Plaintiffs attempted to refinance the mortgage on their home, but they were informed that they needed to pay the PACE loan in order to obtain financing because the Ygrene lien was a superior lien.

**SECOND AMENDED CLASS ACTION COMPLAINT**

181.    Plaintiffs were forced to satisfy the Ygrene lien, including payment of a prepayment penalty, payoff statement fee, and administrative fee to Ygrene.

182.    Based on Ygrene's misrepresentations and omissions, Plaintiffs understood that the Ygrene loan would transfer to subsequent owners of the property, and would not need to be satisfied at the time of sale or refinance.

183.    Had Plaintiffs known the truth about Ygrene's loan, Plaintiffs would not have entered into an agreement through Ygrene. Plaintiffs would not have agreed to the prepayment penalty provision and/or would not have financed their home improvement work through Ygrene had they known that the loan was not transferable with the property or would impede efforts to refinance.  Plaintiffs did not agree, and would not have agreed, to pay any of the associated administrative fees at the time they took the loan.

### Grachian L. Smith and Mary J. Loudenslager-Smith

184.    Plaintiffs, Grachian L. Smith and Mary J. Loudenslager-Smith, are a married couple who own their primary residence located in Hollywood, Florida. Plaintiffs obtained a PACE loan through Ygrene.

185.    After learning of the Ygrene program from a roofing contractor, Plaintiffs contacted Ygrene and we referred to Florida Home Improvement Associates, Inc. ("FHI"), a Ygrene "certified" contractor.

186.    On or about October 2016, Plaintiffs met with "Rob," a representative from FHI. Plaintiff, Mary J. Loudenslager-Smith, recalls that "Rob" is a Hispanic male in his 40's, with dark hair.

187.    "Rob" explained the Ygrene program to Plaintiff, Mary J. Loudenslager-Smith, including that there would be no upfront costs and that the payments would be included in their annual property taxes.

188.    Additionally, "Rob" stated to Plaintiff, Mary J. Loundenslager-Smith, that she and her husband would not be personally responsible for the Ygrene Loan and that it "would stay with the house."

189.    Plaintiffs relied on these statements and would not have proceeded to pursue the

**SECOND AMENDED CLASS ACTION COMPLAINT**

loan if they had known that these statements were false and misleading.

190.   Additionally, Ygrene required that Plaintiffs sign a Financing Agreement, a document created by Ygrene, bearing Ygrene's name and logo, and containing the following deceptive disclosure:

> The FHFA appears to have instructed its GSEs not to purchase residential loans where there is a superior lien for qualifying improvements, such as the assessment lien. Thus, in order to refinance your residential loan, or for a prospective purchaser of your property to obtain a loan secured by the property, you may need to remove the assessment lien by prepaying the assessment obligation in full….A prepayment premium may be applied on assessments that are paid early.

191.   The documents were sent to Plaintiffs electronically, and Ygrene did not guide Plaintiffs through the documents before they were executed by Plaintiffs.

192.   At no point in time did Ygrene adequately disclose to Plaintiffs they would almost certainly have to "pay off" the PACE loan as a "require[ment]" to refinance or as a "condition of sale."

193.   Plaintiffs were charged a Pre-Payment Waiver Fee of $221.34 without explanation. Plaintiffs did not agree to this fee, and would not have agreed, since pre-payment penalties should not have been charged by Ygrene at all if its representations that the PACE loans transfer with the properties were true.

194.   In obtaining a PACE loan through Ygrene, Plaintiffs relied upon Ygrene's omissions and deceptive representations to their detriment.

195.   Based on Ygrene's misrepresentations and omissions, Plaintiffs understood that their Ygrene loan would transfer to subsequent owners of their home.

196.   Had Plaintiffs known the truth about Ygrene's loan program, Plaintiffs would not have entered into an agreement through Ygrene, and would not have agreed to payment of the Pre-Payment Waiver Fee.

**Alejandro Marcey and Felicia Marcey**

197.   Plaintiffs, Alejandro Marcey and Felicia Marcey, are a married couple who own their primary residence located in Chula Vista, California. Plaintiffs obtained a PACE loan

1  through Ygrene.

2       198.    After having applied online for pre-approval via the Ygrene website

3  (https://ygreneworks.com) in approximately August 2015, a Ygrene-certified contractor, Chad

4  Fuller of Professional Roofing Services in El Cajon, California, visited Plaintiffs' home to

5  provide Plaintiffs with an estimate for a roof replacement and new windows. Mr. Fuller then told

6  Plaintiffs about various advantages offered by the Ygrene program.

7       199.    During this initial consultation, Chad Fuller represented to Plaintiffs that Ygrene's

8  loans do not have any impact on the ability to sell or refinance, stating that the loans are

9  "transferable" with the property. Chad Fuller also represented that a HERO program loan would

10  result in a lien on the title of their home, whereas a Ygrene program loan would be through their

11  property taxes and would be considered a Mello Roos special tax that can be fully deductible.

12  Plaintiffs relied on these representations in deciding to finance their home improvement through

13  Ygrene.

14       200.    Prior to entering into the PACE loan, Plaintiffs reviewed Ygrene's website and

15  marketing materials, including Ygrene flyers provided by Chad Fuller. These flyers advertised

16  "Non-Recourse Financing" and made the following representations:

17           • "If the property is sold, the tax assessment moves with the sale to the new

18             owner;"

19           • "Because the special assessment appears on the property taxes, you may be

20             able to expense the entire amount, including the principal and interest;"

21           • "Because the transaction has no effect on your capital budget, it doesn't affect

22             your credit outlook. You can enjoy the many benefits of high performance

23             buildings, while allowing your energy improvement projects to pay for

24             themselves;" and

25           • "Q: What are the benefits of making payments on my property tax bill? A: It is

26             a great idea for many reasons. You won't make your first payment for up to 17

27             months, payments are tax deductible, and stay with the property when you

28             move.

**SECOND AMENDED CLASS ACTION COMPLAINT**

201.    Plaintiffs also relied on these representations made in Ygrene flyers when they were deciding to finance their home improvement through Ygrene.

202.    When Plaintiffs visited Ygrene's website (https://ygreneworks.com) in August 2015 to learn about the program, they watched Ygrene's promotional video. In this promotional video, Ygrene made the following misrepresentations to Plaintiffs:

- "If you sell your property, the payments transfer to the new owners just like your property tax. So you only pay for what you use."

- "It's as if your house is borrowing the money, not you personally. As a result, we don't need to look at your credit score, verify your employment, or review your financial statements." [30]

203.    Ygrene required that Plaintiffs sign a Unanimous Approval Agreement, a document created by Ygrene, bearing Ygrene's name and logo, and containing the following deceptive disclosure:

> The FHFA appears to have instructed its GSEs not to purchase home loans where there is a superior lien for clean-energy improvements, such as the special-tax lien. Thus, in order to refinance your home loan, or for a prospective purchaser of your property to obtain a loan secured by the property, you may need to remove the special-tax lien by prepaying the special-tax obligation in full.

204.    In obtaining a PACE loan through Ygrene, Plaintiffs relied upon Ygrene's omissions and deceptive representations to their detriment.

205.    Based on Ygrene's misrepresentations and omissions, Plaintiffs understood that their Ygrene loan would transfer to subsequent owners of their home—and that they would not have to prepay the loan or incur any prepayment penalty.

206.    Had Plaintiffs known the truth about Ygrene's loan, Plaintiffs would not have entered into an agreement through Ygrene.

207.    Plaintiffs attempted to refinance in April 2016. They were met with the unexpected

---

[30] Defendants have since removed this video from their website.  The video viewed by Plaintiff is available at https://www.youtube.com/watch?v=vlzVpTCZB5g; (last accessed on August 21, 2017).  Defendants have replaced the video viewed by Plaintiff with one that states: "If you sell your property, in some cases, payments may transfer to the new owner."  *See* https://ygreneworks.com/; (last accessed on August 21, 2017).

**SECOND AMENDED CLASS ACTION COMPLAINT**

news that they would not be able to refinance without fully satisfying the loan and paying a prepayment penalty—something they could not afford to do.

208.   After speaking with several lenders, they were forced to accept an FHA loan with unfavorable terms, on the condition that they take out extra mortgage insurance.  Plaintiffs did so, at an out-of-pocket cost of $267/month.

## CLASS ACTION ALLEGATIONS

209.   Plaintiffs bring this case as a class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated.

210.   Plaintiffs bring this case on behalf of the following Classes under Fed. R. Civ. P. 23(b)(2):

### Nationwide Prepayment Penalty Class

**All persons within the United States who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, where the loan contained a provision for a prepayment penalty.**

### California Prepayment Penalty Subclass

**All persons within the State of California who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, where the loan contained a provision for a prepayment penalty.**

### Florida Prepayment Penalty Subclass

**All persons within the State of Florida who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, where the loan contained a provision for a prepayment penalty.**

### Nationwide Prepayment Waiver Fee Class—Not Yet Paid

**All persons within the United States who, within the four (4) years prior to the filing of this Complaint, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, where the loan contained a provision for a prepayment penalty and/or where Ygrene assessed a Prepayment Waiver Fee.**

## California Prepayment Waiver Fee Subclass—Not Yet Paid

All persons within the State of California who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, where the loan contained a provision for a prepayment penalty and/or where Ygrene assessed a Prepayment Waiver Fee.

## Florida Prepayment Waiver Fee Subclass—Not Yet Paid

All persons within the State of Florida who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, where the loan contained a provision for a prepayment penalty and/or where Ygrene assessed a Prepayment Waiver Fee.

## Nationwide Payoff and Administrative Fee Class—Not Yet Paid

All persons within the United States who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, and who will be required to pay a Redemption Premium (prepayment penalty), a payoff statement fee, an Administrative Fee, and/or an Escrow/Custodial Fee.

## California Payoff and Administrative Fee Subclass—Not Yet Paid

All persons within the State of California who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, and who will be required to pay Redemption Premium (prepayment penalty), a payoff statement fee, an Administrative Fee, and/or an Escrow/Custodial Fee.

## Florida Payoff and Administrative Fee Subclass—Not Yet Paid

All persons within the State of Florida who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, and who will be required to pay Redemption Premium (prepayment penalty),

1     **a payoff statement fee, an Administrative Fee, and/or an Escrow/Custodial Fee.**

2     211.    Plaintiffs bring this case on behalf of the following Classes under Fed. R. Civ. P.

3     23(b)(3):

### Nationwide Prepayment Penalty Class—Paid

**All persons within the United States who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, and who paid a prepayment penalty.**

### California Prepayment Penalty Subclass—Paid

**All persons within the State of California who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, and who paid a prepayment penalty.**

### Florida Prepayment Penalty Subclass—Paid

**All persons within the State of Florida who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, and who paid a prepayment penalty.**

### Nationwide Payoff and Administrative Fee Class--Paid

**All persons within the United States who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, and who paid a Redemption Premium (prepayment penalty), a payoff statement fee, an Administrative Fee, and/or an Escrow/Custodial Fee.**

### California Payoff and Administrative Fee Subclass--Paid

**All persons within the State of California who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, and who paid Redemption Premium (prepayment penalty), a payoff statement fee, an Administrative Fee, and/or an Escrow/Custodial Fee.**

41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### Florida Payoff and Administrative Fee Subclass--Paid

**All persons within the State of Florida who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence, and who paid a Redemption Premium (prepayment penalty), a payoff statement fee, an Administrative Fee, and/or an Escrow/Custodial Fee.**

### Nationwide Prepayment Waiver Fee Class—Paid

**All persons within the United States who, within the four (4) years prior to the filing of this Complaint, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence paid a Prepayment Waiver Fee.**

### California Prepayment Waiver Fee Subclass— Paid

**All persons within the State of California who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence paid a Prepayment Waiver Fee.**

### Florida Prepayment Waiver Fee Subclass—Paid

**All persons within the State of Florida who, within the four (4) years prior to the filing of this action, entered into a PACE financing loan agreement originated and/or facilitated by Ygrene in connection with their primary residence paid a Prepayment Waiver Fee.**

212.     Excluded from the Classes are Defendants, their affiliates, personnel, agents and members of the Judiciary. Plaintiffs reserve the right to amend the class definition upon completion of class certification discovery.

213.     **Numerosity:** Plaintiffs are informed and believe, and upon such information and belief aver, that the number of persons in the Classes are so numerous that joinder of all members is impracticable. Plaintiffs are informed and believe, and upon such information and belief avers, that the number of class members is in the thousands. The exact number and identities of the Class members are unknown at this time and can only be ascertained through

42

1   discovery.

2       214.   **Commonality:** There are numerous questions of law and fact common to the

3   Classes which predominate over any questions affecting only individual members. The common

4   questions in this case are capable of having common answers. If Plaintiffs' claims regarding

5   Defendants' conduct is accurate, Plaintiffs and the Class members will have identical claims

6   capable of being efficiently adjudicated and administered in this case. Among the questions of

7   law and fact common to the Classes are:

8       a.   Whether Defendants engaged in unlawful, unfair and/or fraudulent business acts or
             practices likely to deceive Plaintiffs and Class Members;

9       b.   Whether Defendants intentionally concealed, omitted and/or otherwise failed to
10           disclose material information to Plaintiffs and Class Members;

11

12      c.   Whether Defendants failed to disclose to Plaintiffs and Class Members that they
             would be unable to refinance or sell their homes without first satisfying their PACE
13           loans and incurring a pre-payment penalty, and payoff and administrative fees;

14      d.   Whether Defendants failed to disclose to Plaintiffs and Class Members that they
             would be charged an unnecessary Pre-Payment Waiver Fee;

15

16      e.   Whether Defendants had a duty to disclose the undisclosed material facts to
             Plaintiffs and Class Members;

17

18      f.   Whether Plaintiffs and Class Members have sustained damages as a result of the
             conduct alleged herein and, if so, what is the proper measure of such damages; and

19      g.   Whether Plaintiffs and Class Members are entitled to injunctive and other equitable
20           relief.

21      215.   **Typicality:** Plaintiffs' claims are typical of the claims of the Class members, as

22   they are all based on the same factual and legal theories, and similar loan documents and

23   disclosures.

24      216.   **Adequacy:** Plaintiffs are representatives that will fully and adequately assert and

25   protect the interests of the Classes, and have retained competent counsel. Accordingly, Plaintiffs

26   are adequate representatives and will fairly and adequately protect the interests of the Classes.

27      217.   **Predominance and Superiority:** A class action is superior to all other available

28   methods for the fair and efficient adjudication of this lawsuit, because individual litigation of the

claims of all members of the Classes is economically unfeasible and procedurally impracticable. While the aggregate damages sustained by Class Members are in the millions of dollars, the individual damages incurred by each member resulting from Defendants' wrongful conduct are too small to warrant the expense of individual lawsuits. The likelihood of individual Class Members prosecuting their own separate claims is remote, and, even if every member of the Class could afford individual litigation, the court system would be unduly burdened by individual litigation of such cases. The prosecution of separate actions by Class Members would create a risk of establishing inconsistent rulings and/or incompatible standards of conduct for Defendants. For example, one court might enjoin Defendants from performing the challenged acts, whereas another may not. Additionally, individual actions may be dispositive of the interests of the Classes, although certain class members are not parties to such actions.

### FIRST CAUSE OF ACTION
### VIOLATION OF THE "UNFAIR" PRONG OF CAL. BUS. & PROF. CODE § 17200, *et seq.* AGAINST YGRENE ENERGY FUND, INC
(California Subclasses)

218.   Plaintiffs incorporate and reallege by reference each and every allegation contained in paragraphs 1-213 as if fully set forth herein.

219.   California's Business & Professions Code § 17200, et seq. (the "UCL"), defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Pro. Code § 17200.

220.   A business act or practice is "unfair" under the UCL if the reasons, justifications and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

221.   Defendant violated the "unfair" prong of the UCL through its affirmative misrepresentations, omissions, and practices described herein.

222.   The gravity of the harm to Plaintiffs and Class Members resulting from these unfair acts and practices outweighed any conceivable reasons, justifications and/or motives of Defendant for engaging in such deceptive acts and practices. By committing the acts and practices alleged

above, Defendant engaged in unfair business practices within the meaning of California Business & Professions Code § 17200, *et seq*.

223.    Through its unfair acts and practices, Defendant has improperly obtained money from Plaintiffs and Class Members. As such, Plaintiffs request that this Court cause Defendant to restore this money to Plaintiffs and all Class Members, and to enjoin Defendant from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiffs and Class Members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

224.    Plaintiffs and Class Members demand the applicable relief set forth in the Prayer for Relief below.

## SECOND CAUSE OF ACTION
### VIOLATION OF THE "FRAUDULENT" PRONG OF CAL. BUS. & PROF. CODE § 17200, *et seq*. AGAINST YGRENE ENERGY FUND, INC
(California Subclasses)

225.    Plaintiffs incorporate and reallege by reference each and every allegation contained in paragraphs 1-213 as if fully set forth herein.

226.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Pro. Code § 17200.

227.    A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

228.    Defendant's representations and omissions as described herein were fraudulent within the meaning of the UCL because they deceived Plaintiffs, and were likely to deceive Class Members.

229.    Defendant's acts and practices as described herein have deceived Plaintiffs and were highly likely to deceive members of the consuming public.

230.    As a result of the conduct described above, Defendant has been unjustly enriched at the expense of Plaintiffs and Class Members. Specifically, Defendant has been unjustly enriched

by obtaining revenue and profits that it would not otherwise have obtained absent its false, misleading and deceptive conduct.

231.    Through its unfair acts and practices, Defendant has improperly obtained money from Plaintiffs and Class Members. As such, Plaintiffs request that this court cause Defendant to restore this money to Plaintiffs and all Class Members, and to enjoin Defendant from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Plaintiffs and Class Members may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

232.    Plaintiffs and Class Members demand the applicable relief set forth in the Prayer for Relief below.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
(Florida Subclasses)

233.    Plaintiffs incorporate and reallege by reference each and every allegation contained in paragraphs 1-213 as if fully set forth herein.

234.    Plaintiffs assert this cause of action on behalf of themselves and Class Members.

235.    Plaintiffs and Class Members are "consumers" as defined by Florida Statute § 501.203(7), and the subject PACE loan transactions are "trade or commerce" as defined by Florida Statute §501.203(8).

236.    FDUTPA was enacted to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

237.    Defendants violated and continue to violate FDUTPA by engaging in the unconscionable, deceptive, unfair acts or practices described herein and proscribed by Florida Statute §501.201, *et seq*. Defendants' affirmative misrepresentations, omissions, and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

238.    Defendants' actions constitute unconscionable, deceptive, or unfair acts or practices because, as alleged herein, Defendants engaged in deceptive conduct by misrepresenting

and omitting material facts regarding its PACE loans, thereby offending an established public policy, and engaging in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

239.   Defendants violated FDUTPA by engaging in unfair and deceptive practices, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.

240.   Defendants' marketing and written disclosures with respect to its PACE loans are inherently deceptive and unfair and are, therefore, a practice that is in violation of FDUTPA.

241.   As a direct and proximate result of Defendants' deceptive practices, Plaintiffs and Members of the Class participated in Ygrene's loan programs, and they would not have done so had they known the truth about Ygrene's PACE loans.

242.   FDUTPA specifically provides for injunctive relief relating to alleged unfair and deceptive trade practices. Without an injunction preventing Defendants from continuing to mislead consumers, Plaintiffs and Class Members will continue to suffer damages.

243.   Pursuant to Florida Statute § 501.211(1), Plaintiffs seek a declaration that Defendants' deceptive conduct has violated and continues to violate FDUTPA, and seek injunctive relief regarding Defendants' past and continuing deceptive conduct. Plaintiffs reserve the right to allege other violations of FDUTPA as Defendants' conduct is ongoing.

244.   In addition, pursuant to Florida Statutes §501.211, Plaintiffs and Class Members seek equitable relief and to enjoin Defendants on terms that the Court considers reasonable. Plaintiffs also seek reasonable attorneys' fees and costs, as well as statutory damages as prescribed by §§ 501.211(2) and 501.2075.

245.   Plaintiffs and Class Members demand the applicable relief set forth in the Prayer for Relief below.

## FOURTH CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT
(California Subclasses)

246.   Plaintiffs incorporate and reallege by reference each and every allegation contained in paragraphs 1-213 as if fully set forth herein.

**SECOND AMENDED CLASS ACTION COMPLAINT**

247.    Plaintiffs entered into PACE loan agreements with various special districts as alleged herein.

248.    At all times, Defendants were aware of the existence of these PACE loan agreements between, on the one hand, Plaintiffs and the class members and, on the other, the special districts.

249.    Defendants tortiously interfered with these contractual relationships and prevented Plaintiffs and the class members from obtaining the full benefits of their contractual relationship with the special districts.

250.    The UAA and Financing Agreements nowhere authorize Defendants to charge excessive and unreasonable administrative fees and prepayment penalties.

251.    Defendants imposed unreasonable penalties and fees on Plaintiffs and members of the class.

252.    Therefore, Defendants tortiously interfered with the performance of Plaintiffs' and the class members PACE loan agreements.

253.    Defendants' tortious interference has resulted in an actual breach of Plaintiffs' and the class members' contracts because Plaintiffs and the class members have been assessed fees and penalties not authorized by the UAA and Financing Agreements.

254.    As a direct, proximate, and foreseeable result of Defendants' tortious interference with Plaintiffs and the class members' contracts, Plaintiffs and the class members have been legally injured and sustained damages by not receiving the full benefit of their contractual bargain.

255.    Plaintiffs and the class members have performed all, or substantially all, of the obligations imposed on them under the UAA and Financing Agreements.

256.    As a direct result of Defendant's breaches, Plaintiffs and members of the Class have sustained economic losses and are entitled to compensatory damages in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
### FRAUDULENT INDUCEMENT
(Nationwide Classes)

257.    Plaintiffs incorporate and reallege by reference each and every allegation

**SECOND AMENDED CLASS ACTION COMPLAINT**

1    contained in paragraphs 1-213 as if fully set forth herein.

2        258.    Defendants had a duty to make full and adequate disclosures to Plaintiffs and Class

3    Members regarding the nature of its loans, as well as all associated penalties and fees.

4        259.    Defendants made materially false statements and omissions regarding its PACE

5    loans to Plaintiffs and Class Members.

6        260.    These facts constitute material information that Plaintiffs and the Class Members

7    would have deemed material when deciding whether to purchase the loan products at issue.

8        261.    In situations where Defendants made some disclosures, Defendants made only

9    partial representations while suppressing material facts, as alleged herein.

10       262.    Defendants' concealment, omissions, and partial representations occurred prior to

11   the consummation of the loan transactions with Plaintiffs and the Class Members and are continued

12   in the terms of the loan documents.

13       263.    Had Defendants disclosed this information, Plaintiffs and the Class Members

14   would not have agreed to the subject PACE loans on these terms.

15       264.    At all relevant times, Defendants actively concealed and suppressed these material

16   facts from Plaintiffs and Class Members. Defendants had superior knowledge of the concealed

17   facts.

18       265.    Defendants had knowledge that their materially false statements and omissions

19   regarding its PACE loans were false when made.

20       266.    In making materially false statements and omissions regarding the PACE loans, it

21   was Defendants' intention to induce Plaintiffs and Class Members to rely on the materially false

22   statements and omissions to enter into the subject PACE loans.

23       267.    In entering into the subject PACE loans, Plaintiffs and Class Members reasonably

24   relied and acted upon the materially false statements and omissions made by Defendants.

25       268.    Plaintiffs and Class Members have suffered damages as a result of their reasonable

26   reliance upon Defendants' materially false statements and omissions set forth above.

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT**

269.    As a direct and proximate result of Defendants' intentional omissions and misrepresentations of material fact, as alleged herein, Plaintiffs and Class Members have suffered damages.

270.    Plaintiffs and Class Members demand the applicable relief set forth in the Prayer for Relief below.

**SIXTH CAUSE OF ACTION**
**NEGLIGENT MISREPRESENTATION**
(Nationwide Classes)

271.    Plaintiffs incorporate and reallege by reference each and every allegation contained in paragraphs 1-213 as if fully set forth herein.

272.    Defendants had a duty to Plaintiffs and Class Members to fully disclose the true nature of its loan products, as well as all associated penalties and fees.

273.    Defendants breached their duty and were negligent to Plaintiffs and Class Members by failing to clearly and adequately advise Plaintiffs and Class Members of all material information regarding its loan products.

274.    Defendants knew or should have known that its wrongful acts and omissions would cause damages to Plaintiffs and Class Members

275.    Defendants' conduct has directly and proximately caused damage to Plaintiff and Class Members.

276.    Plaintiffs and Class Members demand the applicable relief set forth in the Prayer for Relief below.

**SEVENTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
(Florida Subcasses)

277.    Plaintiffs incorporate and reallege by reference each and every allegation contained in paragraphs 1-213 as if fully set forth herein.

278.    Plaintiffs and Class Members conferred a benefit upon Defendants in the form of various origination and closing fees, prepayment fees, administrative fees, and other fees and payments.

279.    Defendants had knowledge of the benefits conferred upon them by Plaintiffs and Class Members.

280.    Defendants voluntarily accepted and retained the benefits conferred upon them by Plaintiffs and Class Members.

281.    Under the circumstances, it would be inequitable for Defendants to retain the benefit conferred upon them by Plaintiffs and Class Members.

282.    Defendants have been unjustly enriched and are required to refund Plaintiffs and Class Members the benefits they conferred upon Defendants.

283.    Plaintiffs and Class Members demand the applicable relief set forth in the Prayer for Relief below.

## EIGHTH CAUSE OF ACTION
### NEGLIGENCE
(Nationwide Classes)

284.    Plaintiffs incorporate and reallege by reference each and every allegation contained in paragraphs 1-213 as if fully set forth herein.

285.    Defendants had a duty to fully disclose to Plaintiffs and Class Members the true nature of its loan products, as well as all associated penalties and fees.

286.    Defendants breached their duty by failing to provide adequate disclosures to Plaintiffs and Class Members.

287.    Defendants knew or should have known that their wrongful acts and omissions would cause damage to Plaintiffs and Class Members.

288.    Defendants' conduct has directly and proximately caused damages to Plaintiffs and Class Members.

289.    Plaintiffs and Class Members demand the applicable relief set forth in the Prayer for Relief below.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs and the Class respectfully request the following and pray for judgment as follows:

1.    For a declaration that this lawsuit may properly be maintained as a class action and certifying the Class claims herein;

2.    Award Plaintiffs and Class Members injunctive relief in the form of a promise not

to charge prepayment penalties; a promise not to charge unauthorized administrative fees; and that Ygrene adopt the practice of providing adequate disclosures.

3. Award Plaintiffs and Class Members damages flowing from the requested injunction;

4. Appoint the undersigned as Class Counsel;

5. Appoint Plaintiffs as Representatives of the Class;

6. Award other declaratory and injunctive relief as permitted by law;

7. Award reasonable attorneys' fees, filing fees, expert fees, and costs of suit to counsel based upon the benefit received by Plaintiffs and Class;

8. Award Plaintiffs and Class Members actual damages;

9. Award Plaintiffs and Class Members attorneys' fees and all litigation costs; and

10. Award Plaintiffs and Class Members any further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves and the Class, hereby demand a jury trial for all issues so triable.


Dated: August 25, 2017

**KASDAN LIPPSMITH WEBER TURNER LLP**


By:  /s/ *Graham B. LippSmith*
   GRAHAM B. LIPPSMITH
   JACLYN L. ANDERSON

   **TYCKO &ZAVAREEI LLP**
   JEFFREY D. KALIEL
   ANNICK M. PERSINGER
   SOPHIA J. GOREN

   **HIRALDO P.A.**
   MANUEL S. HIRALDO

   *Attorneys for Plaintiffs*

**SECOND AMENDED CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2017, I electronically filed the **SECOND AMENDED CLASS ACTION COMPLAINT** with the Clerk of the Court, using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF system to receive service.

*/s/ Graham B. LippSmith*
Graham B. LippSmith