UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

| | |
|---|---|
| GEORGE W. WOOLEY, TAMMY S. WOOLEY, MICHAEL G. PEKEL, ANTHONY LOOK, JR., KIMBERLY LOOK, GRACIAN L. SMITH, MARY L. LOUDENSLAGER-SMITH, ALEJANDRO MARCEY, and FELICA MARCEY, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>YGRENE ENERGY FUND, INC.; YGRENE ENERGY FUND FLORIDA LLC; and DOES 1 through 10, inclusive,<br><br>Defendants. | Case No. 17-cv-01258-LB<br><br>**ORDER GRANTING MOTION TO DISMISS THE SMITHS' CLAIMS AND DENYING THE MOTION TO DISMISS THE CALIFORNIA TORTIOUS-INTERFERENCE CLAIM**<br><br>Re: ECF No. 45 |

**INTRODUCTION**

The plaintiffs — on behalf of a national class and California and Florida subclasses — sue Ygrene Energy for fraud relating to home-improvement loans. The plaintiffs allege that the defendants falsely told them that the loans would attach to their properties (like property taxes) and, correspondingly, failed to reveal that the loans would have to be repaid when a property was sold or refinanced. The plaintiffs claim that, contrary to the defendants' representations, they

indeed had to repay the loans when they sold or refinanced their homes — at which point they incurred prepayment penalties.[1]

The defendants move to dismiss the claims of two named plaintiffs — Florida residents Grachian Smith and Mary Loudenslager-Smith — on the ground that the written disclosures to them adequately disclosed the possibility of prepayment.[2] They move to dismiss the California subclass's claim for tortious interference with a contract on the ground that plaintiffs cannot state a claim against an agent for a party to the contract at issue.[3] The court grants the motion to dismiss the Smiths' claims on the ground that the written disclosures to them adequately disclose the risks of prepayment to them. It denies the motion to dismiss the tortious-interference claim because it cannot conclude as a matter of law at the pleadings stage that Ygrene functioned as the special districts' agent.

## STATEMENT

### 1. The Parties and Jurisdiction

The named plaintiffs are California or Florida residents and homeowners.[4] They sue on their own behalf and on behalf of national classes and California and Florida subclasses. Defendant Ygrene Energy Fund, Inc. is alleged to be a Delaware corporation with its headquarters in Sonoma County, California; defendant Ygrene Energy Fund Florida, LLC, a limited-liability company is headquartered in Tampa, Florida.[5] The plaintiffs allege that at least one member of a proposed national class, a class "numbering in the tens of thousands," will be from a state "different . . . [from] that of Defendants." They also allege an amount in controversy exceeding $5 million.[6] The

---

[1] Second Amend. Compl. ("SAC") – ECF No. 44. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Motion – ECF No. 45 at 10.

[3] *Id.*

[4] The Florida plaintiffs are: George W. and Tammy S. Woolley; Michael G. Pekel; and Grachian L. Smith and Mary J. Loudenslager-Smith. The California plaintiffs are: Anthony Look, Jr. and Kimberly Look; and Alejandro and Felicia Marcey. SAC – ECF No. 44 at 2 (¶¶ 1–11).

[5] *Id.* at 2 (¶¶ 10–11). The court sometimes refers to the defendants collectively as "Ygrene."

[6] *Id.* at 3 (¶ 14).

ORDER – No. 17-cv-01258-LB           2

court thus has subject-matter jurisdiction of this dispute under the "minimal diversity" rule of the Class Action Fairness Act. 28 U.S.C. § 1332(d)(2).

**2. PACE Loans**

The subject of this dispute is "Property Assessed Clean Energy" (PACE) loans.[7] These are home-improvement loans that finance environmental upgrades to residential properties (such as solar panels or better windows).[8] PACE loans take an unusual form. Unlike traditional loans, PACE loans do not involve a straightforward extension of credit from a lender, who then receives periodic repayments directly from the borrower. Instead, PACE loans are created as tax liens on the given property; homeowners then repay the loan as a special tax assessment.[9]

PACE loans represent a partnership between state or local governments, on the one hand, and private finance companies like Ygrene, on the other. The government creates a special tax-assessment district in which PACE loans will be made. The plaintiffs explain:

> PACE loans are a financing structure by which residential property owners are permitted to opt into a special assessment district to receive financing for energy improvements and retrofits on their homes. The loans are repaid through an annual assessment on the owner's property tax bill. A lien in the amount of the loan is placed on the home.[10]

According to the plaintiffs, "Ygrene's PACE loans are no different than private loans except that the terms are less favorable when compared to conventional loans, and instead of a monthly billing statement, borrowers receive an annual tax assessment."[11]

The defendants market and administer PACE programs, provide "initial funding" for PACE loans, and ultimately receive the homeowners' payments.[12] They also securitize the bonds that result from individual loans and sell these securities to investors.[13] The plaintiffs describe

---

[7] *Id.* at 4 (¶¶ 18–19).
[8] *Id.* at 4, 18, 42 (¶¶ 18–19, 78, 209–10).
[9] *Id.* at 4 (¶ 19).
[10] *Id.* (¶ 20).
[11] *Id.* at 16 (¶ 80).
[12] *Id.* at 5, 18–19 (¶¶ 20, 77, 81–82).
[13] *Id.* at 17 (¶ 87).

Ygrene's business model more fully:

> Ygrene acts as a lender by using private capital to provide financing to property owners in the PACE districts it administers. Ygrene's capital sources and structure include a $100 million revolving line of credit for the initial funding of PACE loans.[14]
>
> Funding for a specific project is accomplished by the special PACE district's (e.g. The Green Corridor) issuing revenue bonds secured by special tax liens. The revenue bond is used as the financial instrument to allow the flow of private capital from Ygrene to home improvement projects. As part of the agreement between the district and Ygrene, the district sells and assigns all of its rights to receive the special tax revenues to Ygrene.[15]
>
> More specifically, the district issues a revenue bond to fund the PACE program. The bond is privately placed with Ygrene and issued as a single drawdown bond. Ygrene funds the purchase price of the bond by making advances. Each advance is considered a "sub-series bond" of the drawdown bond.[16]
>
> The drawdown bond is in the form of a revolving line of credit, allowing for the repayments of amounts drawn and the re-borrowing of such repaid amounts. Each advance is secured by a Financing Agreement and a senior priority assessment lien on the property.[17]
>
> Each individual property owner within the district desiring to finance an energy improvement enters into a Financing Agreement with the district under which the property owner agrees to the district's imposition of a non-ad valorem assessment on the property.[18]
>
> Each sub-series bond is secured solely by its own collateral, consisting of the Financing Agreement (evidencing the assessment lien) and a revenue account.
>
> When it holds a sufficient amount of sub-series bonds, Ygrene securitizes the bonds and sells them to private investors.[19]

"As part of its services," the plaintiffs allege, "Ygrene provides program design, marketing, administrative duties, origination, application processing, and ongoing reporting services."[20]

---

[14] *Id.* at 16–17 (¶ 81).

[15] *Id.* at 17 (¶ 82).

[16] *Id.* (¶ 83).

[17] *Id.* (¶ 84).

[18] *Id.* (¶ 85).

[19] *Id.* (¶ 87).

[20] *Id.* at 18 (¶ 98).

ORDER – No. 17-cv-01258-LB                 4

1  "Most importantly, Ygrene is solely responsible for developing loan documents and disclosures
2  that are provided to consumers."[21]

### 3. The Dispute

The dispute concerns whether, and to what extent, PACE liens are attached to the property. More exactly, the plaintiffs complain that Ygrene falsely told them that the PACE loans would not have to be repaid when a borrower sold or refinanced her home. Through various channels, the plaintiffs claim, the defendants told them that the PACE liens would be transferred with the property to new owners (much like regular property taxes), so that, when the plaintiffs sold or refinanced their homes, they would not have to repay whatever balance remained on the PACE loan.

As it happens, PACE loans "do **not** travel with the home — in fact, they make it impossible or nearly impossible for consumers to sell their homes without first paying off the loan and incurring a large prepayment penalty. This is because conventional lenders refuse to provide loans on properties encumbered by Ygrene's PACE loans, which benefit from superpriority status."[22] "[O]n at least three occasions since 2010," the plaintiffs recount, the Federal Housing Finance Agency (FHFA) "has made clear that . . . Fannie Mae and Freddie Mac should neither purchase nor refinance mortgages with PACE loans attached."[23] As a result of the FHFA's position, PACE loan borrowers have been unable to sell their homes without first satisfying their PACE loans.

Contrary to the defendants' alleged representations, then, plaintiffs would have to repay the entire remaining PACE loan (and a prepayment penalty) when they sold or refinanced their homes. The plaintiffs thus see deception in the defendants' repeated warning that PACE loans "may" not transfer with the property. As the plaintiffs describe the situation, if it is possible in principle that PACE loans will transfer with the property, in practice it is virtually certain that PACE debt must

---

[21] *Id.* at 19 (¶ 100).

[22] *Id.* at 6 (¶ 26) (emphasis in original).

[23] *Id.* (¶ 29.)

ORDER – No. 17-cv-01258-LB    5

be fully repaid on sale or refinance.[24]

In particular, the plaintiffs locate falsehoods in two written loan disclosures: the "Universal Approval Agreement" (UAA) that was used for California transactions; and the "Financing Agreement" (FA) used in Florida. According to the plaintiffs, the UAA and FA both

> misrepresent[] the nature of PACE loans by saying only that: (1) "certain" lenders desire to comply with FHFA guidance (when virtually all do); (2) the FHFA "appears to have instructed" lenders not to purchase loans with attached PACE loans (when both the FHFA and other agencies repeatedly stated this fact with certainty); and . . . (3) "you may" need to . . . "prepay the tax-assessment obligation" if a homeowner wanted to sell or refinance] (when a homeowner is actually at serious risk of having to "pay off" the loan obligation as a "require[ment] of refinancing or as a "condition of sale). . . .[25]

The plaintiffs also allege that "Ygrene uses a network of over 3,200 home contractors [the contractors who will install the PACE-funded improvements] to drum up business."[26] "These contractors act as de facto mortgage brokers and are often the primary point of contact between Ygrene and its borrowers."[27] "Ygrene provides little and inaccurate training to these contractors, whose primary incentive it is to sign up additional homeowners, collect Ygrene's referral fee for doing so, and ultimately charge unusually high costs for the energy-efficiency improvement work. The result is unregulated lending with unqualified and self-interested contractors acting as mortgage brokers." [28]

"These de facto loan agents routinely and systematically misrepresent the characteristics of Ygrene PACE loans, often under Ygrene's instruction and based on Ygrene's misinformation."[29] The contractors "use marketing materials and talking points prepared in a uniform fashion by Ygrene."[30] "Upon information and belief," Ygrene had corporate policies and procedures whereby

---

[24] *Id.* at 6–7 (¶¶ 29–30).

[25] *Id.* at 23, 25 (¶¶ 118, 125).

[26] *Id.* at 19 (¶ 101).

[27] *Id.* (¶ 102).

[28] *Id.* (¶ 103).

[29] *Id.* (¶ 104).

[30] *Id.* at 21 (¶ 107).

it "instructed its employees, agents, and certified contractors to represent to consumers that its PACE loans are always transferable at the time of sale or refinance."[31] Under the policies and procedures, "Ygrene employees, agents, and certified contractors routinely respond to customer inquiries about the impact on the sale or refinance of a property encumbered by a Ygrene lien by stating that the lien would have no impact whatsoever, and would transfer with the property to the new owner."[32]

**5. The Proposed Classes**

The named plaintiffs sue for themselves and for national classes and California and Florida subclasses. Under Federal Rule of Civil Procedure 23(b)(2), they propose 9 classes: 3 national classes; 3 California subclasses; and 3 Florida subclasses. These classes are distributed equally among three topics: "Prepayment Penalty"; "Prepayment Waiver Fee — Not Yet Paid"; and "Payoff and Administrative Fee — Not Yet Paid".[33] Under Rule 23(b)(3), they propose 9 classes again: 3 national classes, 3 California subclasses, and 3 Florida subclasses. These classes are distributed equally among three topics: "Prepayment Penalty — Paid"; "Payoff and Administrative Fee — Paid"; and "Prepayment Waiver Fee — Paid".[34]

**6. The Claims**

The plaintiffs bring eight claims:

1. California Unfair Competition Law (UCL) (Cal. Bus. & Profs. Code § 17200) (unfair prong) (California subclasses);
2. UCL (fraudulent prong) (California subclasses);
3. Florida Deceptive and Unfair Trade Practices Act (FDUTPA) (Fla. Stat. § 501.201 et seq.) (Florida subclasses);

---

[31] *Id.* at 23 (¶ 114).
[32] *Id.* at 23 (¶ 116).
[33] *Id.* at 39–41 (¶ 210).
[34] *Id.* at 41–42 (¶ 211).

ORDER – No. 17-cv-01258-LB           7

1  4.  tortious interference with contract (California subclasses);

2  5.  fraudulent inducement (national classes).

3  6.  negligent misrepresentation (national classes);

4  7.  unjust enrichment (Florida subclasses); and

5  8.  negligence (national classes).[35]

### 7. The Smiths

The defendants move to dismiss the claims of named plaintiffs Grachian L. Smith and Mary J. Loudenslager-Smith on the ground that the written disclosures to them adequately disclosed the possibility of prepayment.[36]

The Smiths allege the following. They obtained a PACE loan on their home in Hollywood, Florida, through Ygrene.[37] After they learned about the Ygrene program from a roofing contractor, the Smiths "contacted Ygrene and we[re] referred to Florida Home Improvement Associates ("FHI"), a Ygrene 'certified' contractor."[38] In October 2016, they "met with 'Rob,' a representative from FHI."[39] According to the Smiths, "'Rob' explained the Ygrene program to . . . [Ms.] Loudenslager-Smith, including that there would be no upfront costs and that the payments would be included in their annual property taxes."[40] He said that the Smiths "would not be personally responsible for the Ygrene Loan and that it 'would stay with the house.'"[41] The complaint says that the Smiths signed Ygrene's Financing Agreement with the following disclosure:

---

[35] *Id.* at 44–51.
[36] Motion – ECF No. 45 at 2.
[37] SAC at 35 (¶ 184).
[38] *Id.* (¶ 185).
[39] *Id.* (¶ 186).
[40] *Id.* (¶ 187).
[41] *Id.* (¶ 188).

ORDER – No. 17-cv-01258-LB            8

> The FHFA appears to have instructed its GSEs not to purchase residential loans where there is a superior lien for qualifying improvements, such as the assessment lien. Thus, in order to refinance your residential loan, or for a prospective purchaser of your property to obtain a loan secured by the property, you may need to remove the assessment lien by prepaying the assessment obligation in full…. A prepayment premium may be applied on assessments that are paid early.[42]

The Financing Agreement "was sent . . . electronically, and Ygrene did not guide [the Smiths] through the documents before they were executed by [the Smiths]."[43] The Smiths "were charged a Pre-Payment Waiver Fee of $221.34 without explanation."[44] The "pre-payment penalties should not have been charged by Ygrene at all if its representations that the PACE loans transfer with the properties were true."[45] The Smiths "understood that their Ygrene loan would transfer to subsequent owners of their home."[46]

Ygrene filed the Smiths' signed Financing Agreement and the signed Notice of Rights that they received.[47] The full disclosure in the Financing Agreement is as follows:

> Many lenders that make residential loans desire to preserve the option to sell those loans to U.S. government-sponsored enterprises (called "GSEs") that are regulated by the Federal Housing Finance Agency ("FHFA"). The FHFA appears to have instructed its GSEs not to purchase residential loans where there is a superior lien for qualifying improvements, such as the assessment lien. Thus, in order to refinance your residential loan, or for a prospective purchaser of your property to obtain a loan secured by the property, you may need to remove the assessment lien by prepaying the assessment obligation in full. **You thus should consider the likelihood and timing of a possible refinancing or sale of your property, and the costs to prepay the assessment obligation, in deciding whether to participate in the program by executing this agreement.** A prepayment premium may be applied on assessments that are paid early.[48]

---

[42] *Id.* at 36 (¶ 190).

[43] *Id.* (¶ 191).

[44] *Id.* (¶ 193).

[45] *Id.* (¶ 193, 195).

[46] *Id.* (¶195).

[47] The court considers the Finance Agreement. *See Green v. ADT, LLC*, No. 16-CV-02227, 2016 WL 3208483, at *4 (N.D. Cal. Jun. 10, 2016) (considered an agreement referenced in the complaint in ruling on a motion to dismiss); *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (incorporation-by-reference doctrine). The plaintiffs suggest that the Notice of Rights is disputed, but they "do not concede . . . that it is true or accurate or that it was validly executed by the Smiths." Opposition – ECF No. 48 at 12. The plaintiffs address it on the merits anyway and conceded its authenticity at the November 2, 2017 hearing. The court thus considers it.

[48] Financing Agreement, Ex. A – ECF No. 45-1 at 7 (§ 9).

The bolded language was omitted from the SAC and replaced with an ellipses.

The Notice of Rights had the following disclosures:

> 6. In accordance with Florida law, the lien securing the obligation to pay the special assessments will be senior to all private liens, including existing mortgage(s). Many mortgage and loan documents limit the ability of a Property Owner to place senior liens on property without the consent of the lender, or authorize the lender to obligate borrowers to prepay the senior obligation.[49]
>
> 7. The [FHFA] has issued policy guidelines that question the validity of PACE assessments; however, Florida law only requires the Property Owner to NOTIFY their mortgage holder of their intent to participate in the PACE program. Consent of the mortgage holder is NOT required. Therefore, the contractual relationship with any lender is the sole responsibility of the Property Owner. Many financial institutions that make home loans desire to preserve the option to sell those loans to the entities that are regulated by the FHFA. The FHFA appears to have instructed its GSEs not to purchase home loans when there is a senior lien such as a PACE special assessment. Therefore, in order to refinance your home loan, or for a prospective purchaser of your property to obtain a loan secured by the property, the special assessment may need to be paid off.[50]

## GOVERNING LAW: RULES 12(b)(6) AND 9(b)

A Rule 12(b)(6) motion to dismiss for failure to state a claim tests the legal sufficiency of a complaint. *Navarro v. Block,* 250 F.3d 729, 732 (9th Cir. 2001). A claim will normally survive a motion to dismiss if it offers a "short and plain statement . . . showing that the pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). This statement "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a mere possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of

---

[49] Notice of Rights, Ex. B – ECF No. 45-1 at 20 (¶ 6).

[50] *Id.* at 20 (¶ 7).

ORDER – No. 17-cv-01258-LB            10

the line between possibility and plausibility of 'entitlement to relief.''" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

When considering a Rule 12(b)(6) motion, the court must accept as true all factual allegations in the complaint as well as all reasonable inferences that may be drawn from such allegations. *LSO, Ltd. v. Stroh,* 205 F.3d 1146, 1150 n. 2 (9th Cir. 2000). Such allegations must be construed in the light most favorable to the nonmoving party. *Shwarz,* 234 F.3d at 435. "[W]hen a written instrument contradicts allegations in the complaint to which it is attached," however, "the exhibit trumps the allegations." *Gamble v. GMAC Mortg. Corp.*, 2009 WL 400359, *3 (N.D. Cal. Feb. 18, 2009) (quoting *N. Ind. Gun & Outdoor v. City of South Bend*, 163 F.3d 449, 454 (7th Cir. 1998)).

Fraud allegations elicit a more demanding standard. Rule 9(b) provides: "In alleging fraud . . . , a party must state with particularity the circumstances constituting fraud . . . . Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). This means that "[a]verments of fraud must be accompanied by the 'who, what, when, where, and how' of the misconduct charged." *Vess v. Ciba–Geigy Corp. USA,* 317 F.3d 1097, 1106 (9th Cir. 2003). Like the basic "notice pleading" demands of Rule 8, a driving concern of Rule 9(b) is that defendants be given fair notice of the charges against them. *See, e.g., In re Lui*, 646 F. App'x 571, 573 (9th Cir. 2016) ("Rule 9(b) demands that allegations of fraud be specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge and not just deny that they have done anything wrong.") (quotation omitted); *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (Rule 9(b) requires particularity "so that the defendant can prepare an adequate answer"). This heightened-pleading standard can apply even to claims that do not innately require proof of fraud. *E.g., Vess*, 317 F.3d at 1103–05. If such a claim nonetheless avers fraudulent conduct, then at least those averments must satisfy Rule 9(b); and, if a claim rests "entirely" on a "unified course of fraudulent conduct," then "the pleading of that claim as a whole must satisfy the particularity requirement of Rule 9(b)." *Id.* at 1103–04. Finally, "[a] motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b) for failure to plead with particularity is the functional equivalent of a motion to dismiss under Rule 12(b)(6) for failure to state a claim." *Id.* at 1107.

**ANALYSIS**

**1. The Smiths' Claims**

The court previously held that the class claims survived to the extent that they were based on representations in the Unanimous Approval Agreements and Financing Agreements.[51] The plaintiffs claim that the written disclosures — which suggest the PACE obligation "may" not transfer with the property — are deceptive because it is certain that the PACE debt must be fully repaid on sales or refinance.[52] *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080, 1113 (N.D. Cal. 2010) (bank's representation that "we may choose to pay items in the order of highest dollar amount to lowest dollar amount" was unfair when bank in fact paid fees this way to maximize overdraft revenue), *aff'd in part and rev'd in part*, 704 F.3d 712 (9th Cir. 2012). The misleading disclosures are compounded by self-interested home contractors who push the loans and provide inaccurate information about them — at Ygrene's direction and pursuant to its policies — to get the contracting work.[53] As a result, consumers of PACE loans cannot sell their homes without paying off the loans and paying a large prepayment fee.[54]

Ygrene does not challenge the sufficiency of the complaint for the class claims or for the other named plaintiffs' individual claims. Its motion is narrow: it moves to dismiss the Smiths' claims on the ground that the written disclosures to them adequately disclose the possibility of prepayment. Ygrene argues too that the plaintiffs failed to provide context for the contractor's statements, and the statements are contradicted by the written disclosures.[55] Because the written disclosures disclose the risk, the court dismisses the Smiths' claims.

The Financing Agreement (set forth in the Statement) identifies the risks: (1) lenders want to preserve the option to sell to loans to government-sponsored entities (GSEs) regulated by the FHFA; (2) the FHFA "appears to have instructed its GSEs not to purchase home loans where there

---

[51] Order – ECF No. 41 at 9.

[52] SAC – ECF No. 44 at 6–7, 23, 25 (¶¶ 29–30, 118, 125).

[53] *Id.* at 119, 21, 23 (¶¶ 101–04, 107, 114, 116).

[54] *Id.* at 6–7 (¶¶ 25, 29–30).

[55] Motion – ECF No. 45 at 10.

ORDER – No. 17-cv-01258-LB                    12

is a superior lien for qualifying improvements, such as the assessment lien;" (3) the homeowner "may need to remove the assessment lien by prepaying the obligation in full" and "should consider the likelihood and timing of a possible refinancing or sale of your property, and the costs to prepay the assessment obligation, in deciding whether to participate in this program by executing this agreement;" and (4) "a prepayment premium may be applied on assessments that are paid early."[56]

The Notice of Rights (also in the Statement) also identifies the FHFA guidelines and describes the risks: (1) the PACE lien is a senior lien and lenders can obligate borrowers to prepay the senior obligation; (2) FHFA policy guidelines question the validity of the PACE assessments; (2) many financial institutions that make home loans want to preserve the ability to sell them to entities regulated by the FHFA; (3) the FHFA "appears to have instructed its GSEs [government-sponsored entities] not to purchase home loans when there is a senior lien such as a PACE special assessment;" and (4) "[t]herefore, in order to refinance your home loan, or for a prospective purchaser to obtain a loan secured by the property, the special assessment may need to be paid off."[57]

This is not fraud or deception. Deception under Florida's FDUPA "occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick v. Premier Sales Group, Inc.*, 480 F.3d 1281, 1284 (11th Cir. 2007) (quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.2d 773, 777 (Fla. 2003) (quotation and citation omitted)); *see* Fla. Stat. Ann. § 501.204(1) ("unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful). The words "appears to" and "may" do not make the warning so equivocal that it becomes fraud or even negligence. The Notice warns that the FHFA instructed its GSEs not to buy home loans when there is a senior lien such as a PACE assessment.

The contractor's statements do not alter this conclusion. The defendants point out that there is no context for when the statements were made, and the statements are vague about the Smiths'

---

[56] *See supra* Statement (quoting Financing Agreement, Ex. A – ECF No. 45-1 at 7 (¶ 9).

[57] *See id.* (quoting Notice of Rights, Ex. B – ECF No. 45-1 at 20 (¶¶ 6–7).

obligations. By contrast, Mr. Smith signed the disclosures, which communicated the risks.

Ygrene also argues that the Smiths cannot base their FDUTPA claim on Ygrene's alleged failure to disclose the pre-payment waiver fee because the "fee was clearly and conspicuously disclosed on the Smith Statement."[58] The Estimated Settlement Statement lists a "pre-payment waiver fee" of $221.34 under a list of "elective fees."[59] The plaintiffs argue that the existence of the fee is deceptive and is self-dealing: Ygrene charges a fee to hedge against what it represents is an unlikely risk.[60] More specifically, they argue that the scheme is illegitimate because Ygrene represents prepayment as a "near impossibility . . . that would never be charged in the first place."[61] Under FDUTPA, charging a fee may be a deceptive practice if it is "likely to mislead the consumer acting reasonably under the circumstances, to the consumer's detriment." *Deere Constr., LLC v. Cemex Const. Materials Fla., LLC*, 198 F. Supp. 3d 1332, 1338 (S.D Fla. 2016). If there were a pattern of deceptive practice, then perhaps the argument would have weight. But given the court's conclusion that the disclosures were not deceptive, the court does not find a stand-alone FDUTPA claim based only on the fee.

The court dismisses the Smiths' claims because they did not plausibly plead deceptive disclosures to them.

**2. The California Plaintiffs' Tortious-Interference Claim**

The plaintiffs claim that Ygrene tortiously interfered with their performance of their PACE loans by charging unreasonable penalties and fees.[62] Ygrene moves to dismiss the claim on the ground that the second amended complaint's allegations do not allow for any conclusion except that Ygrene functioned as the special districts' agent.[63] The plaintiffs counter that they do not plead

---

[58] Motion – ECF No. 45 at 25–26.

[59] Settlement Statement, Ex. C – ECF No. 45-1 at 23.

[60] Opp. – ECF No. 48 at 23–24.

[61] SAC – ECF No. 44 at 7 (¶ 34).

[62] *Id.* at 48 (¶¶ 249–52).

[63] Motion – ECF No. 45 at 30.

ORDER – No. 17-cv-01258-LB    14

agency, and their fact allegations in any event do not decisively demonstrate the agency relationship.[64]

The court denies the motion to dismiss. The disputed fact issues are better resolved at summary judgment.

## CONCLUSION

The court grants the motion to dismiss the Smiths' claims without prejudice and with leave to file an amended complaint by November 27, 2017. The court denies the motion to dismiss the tortious-interference claim.

This disposes of ECF No. 44.

**IT IS SO ORDERED.**

Dated: November 4, 2017

LAUREL BEELER
United States Magistrate Judge

---

[64] Opposition – ECF No. 48 at 30–31.