1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                        San Francisco Division

| | |
|---|---|
| 11 GEORGE W. WOOLLEY, TAMMY S.<br>WOOLLEY, ANTHONY LOOK, JR.,<br>12 KIMBERLY LOOK, ALEJANDRO<br>MARCEY, and FELICIA MARCEY,<br>13 individually and on behalf of all others<br>similarly situated<br>14                Plaintiffs,<br>15<br>      v.<br>16<br>17 YGRENE ENERGY FUND, INC., and<br>YGRENE ENERGY FUND FLORIDA,<br>18 LLC,<br>            Defendants. | Case No. 17-cv-01258-LB<br><br>**ORDER DENYING MOTION TO<br>CERTIFY CLASSES**<br><br>Re: ECF Nos. 137, 145, 146, and 157 |

19

20                         **INTRODUCTION**

21      This is a putative class action. The plaintiffs sued Ygrene Energy for misrepresentations

22 relating to home-improvement loans that finance environmental upgrades (such as solar panels or

23 better windows).[1] The loans are called Property Assessed Clean Energy ("PACE") loans, and the

24 alleged misrepresentations are that Ygrene and its agents falsely told homeowners that the loans

25 would attach to their properties (like property taxes) and transfer upon sale to the new owners and,

26

27   ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
[1] Order – ECF No. 52 at 2–3. Citations refer to material in the Electronic Case File ("ECF"); pinpoint
citations are to the ECF-generated page numbers at the top of documents.

28

1    correspondingly, failed to reveal that if homeowners sold their homes or refinanced their

2    mortgages, then they would have to prepay the PACE loans and incur fees.[2]

3        The plaintiffs move to certify California and Florida classes of homeowners who had a PACE

4    loan and who paid the following:" (1) prepayment penalties, giving rise to (a) claims (for the

5    California class) of (i) unfair and fraudulent business practices under California's Unfair

6    Competition Law ("UCL"), (ii) fraudulent inducement, and (iii) negligent misrepresentation, and

7    (b) a claim (for the Florida class) of deceptive and unfair trade practices under Florida's Deceptive

8    and Unfair Trade Practices Act ("FDUTPA"); and (2) "surprise fees" (in the form of

9    administrative fees, escrow/custodial fees, and/or payment-statement fees), giving rise to (a)

10   claims (for the California class) of (i) unfair and fraudulent business practices in violation of the

11   UCL and (ii) tortious interference, and (b) claims (for the Florida class) of (i) deceptive and unfair

12   trade practices in violation of the FDUTPA and (ii) unjust enrichment.[3] The plaintiffs also propose

13   an "equitable relief" class.[4]

14       Ygrene opposes the class-certification motion in part on the grounds that the plaintiffs have

15   not shown that (1) they were exposed to the marketing materials that contain the alleged lie, and

16   (2) the alleged misrepresentation was material, and they relied on the misrepresentation.[5] It also

17   challenges the plaintiffs' damages model.[6]

18       The court denies the plaintiffs' motion to certify the classes, primarily because they did not

19   show that class members were exposed to the challenged marketing materials.

20

21

22

23

24

25   [2] *Id.* at 1–4.

26   [3] Mot. – ECF No. 136-7 at 14–15.

     [4] *Id.* at 16.

27   [5] Opp'n – ECF No. 143-23 at 21–29.

28   [6] *Id.* at 31–32.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**STATEMENT**

The court's earlier orders describe the PACE loans that are the subject of this dispute and the plaintiffs' theories of liability.[7] This order assumes familiarity with those facts and theories and synopsizes the facts that illuminate the decision to deny the motion to certify the classes.

### 1. The PACE Loans

PACE loans are not traditional loans, where a lender loans money, and a borrower repays the loan directly to the lender.[8] Instead, a PACE program — created through state legislative enactments — permits local governments to offer financing (through PACE loans) for clean-energy improvements to residential and commercial properties.[9] PACE financing is secured by a special tax-assessment lien on the property, and the property owner repays a PACE loan through property taxes.[10] The PACE obligation takes priority over mortgages or other financial encumbrances.[11] Thus, if a property owner wants to sell property or refinance a mortgage, the owner must repay the PACE assessment.[12] Early PACE programs involved direct financing from local governments, but now, funding happens through third-party financers such as Ygrene.[13] Relevantly here, Ygrene PACE loans effectively do not transfer.[14]

Ygrene's business model involved sales teams that trained home-improvement contractors, who in turn introduced homeowners to Ygrene's PACE financing for clean-energy property

---

[7] Orders – ECF Nos. 41, 52.

[8] Order – ECF No. 52 at 3.

[9] Cox Decl. – ECF No. 136-10 at 14 (¶ 47).

[10] *Id.*

[11] Leibsohn Dep., Ex. 6 to LippSmith Decl. – ECF No. 136-8 at 216–217 (pp. 97:16–98:4).

[12] Cox Decl. – ECF No. 136-10 at 15–16 (¶¶ 51, 53).

[13] *Id.* at 14–15 (¶ 48).

[14] Cox Decl. – ECF No. 136-10 at 15–16 (¶¶ 51, 53), 19 (¶¶ 65–66).

improvements.[15] Ygrene's "consumer-facing marketing efforts," meaning, sales pitches to homeowners, involved direct mailers and its website."[16]

The plaintiffs complain that Ygrene did not tell homeowners that they had to repay their PACE assessments if they sold or refinanced their homes and instead implied or said that the assessments were transferable, knowing that they were not (based in part on December 2014 guidance from the Federal Housing Finance Agency ("FHFA") to Fannie Mae and Freddie Mac):[17]

> In issuing this statement FHFA wants to make clear to homeowners, lenders, other financial institutions, state officials, and the public that Fannie Mae and Freddie Mac's policies prohibit the purchase of a mortgage where the property has a first-lien PACE loan attached to it. This restriction has two potential implications for borrowers. First, a homeowner with a first-lien PACE loan cannot refinance their existing mortgage with a Fannie Mae or Freddie Mac mortgage. Second, anyone wanting to buy a home that already has a first-lien PACE loan cannot use a Fannie Mae or Freddie Mac loan for the purchase. These restrictions may reduce the marketability of the house or require the homeowner to pay off the PACE loan before selling the house.[18]

Ygrene included the FHFA directive in the training that it gave its contractors, but it did not mention it in other training materials or scripts that the plaintiffs identify.[19] Ygrene taught its contractors at mandatory, in-person trainings that PACE loans were transferable.[20] Ygrene's website said:

> • "What happens if the property is sold? If the property is sold or transferred, the tax payment obligation may be transferred with the property to the new owner."

---

[15] Kelly Dep., Ex. B to Levin Decl. – ECF No. 143-25 at 4 (p. 12:3–16), 5 (p. 67:3–5), 6 (p. 72:11–12), 9–10 (pp. 122:10–123:10), 12–13 (pp. 129:19–130:4), 17 (p. 134:17–18); *see, e.g.*, Fuller Decl., Ex. N to Levin Decl. – ECF No. 143-29 at 2 (¶¶ 1–3).

[16] Kelly Dep., Ex. 5 to LippSmith Decl. – ECF No. 136-8 at 200 (p. 398:7–23), 201 (p. 401:3–6), 202 (p. 410:8–10); Kelly Dep., Ex. B to Levin Decl. – ECF No. 143-25 at 19 (p. 401:3–19).

[17] Kelly Dep., Ex. 5 to LippSmith Decl. – ECF No. 136-8 at 160 (p. 25:17–20), 165–166 (pp. 129:10–130:11), 186–187 (pp. 266:23–267:17), 188–189 (pp. 288:24–289:3); Leibsohn Dep., Ex. 6 to LippSmith Decl. – ECF No. 136-8 at 211 (p. 52:12–21), 212 (p. 53:6–7), 213 (p. 54:9–10); Cox Decl. – ECF No. 136-10 at 15 (¶ 51), 16–17 (¶¶ 55–56), 20–21 (¶¶ 75–77), 22 (¶ 87).

[18] FHFA Statement, Ex. 8 to LippSmith Decl. – ECF No. 136-8 at 242.

[19] Kelly Dep., Ex. 5 to LippSmith Decl. – ECF No. 136-8 at 182–183 (pp. 257:5–258:3), 197 (p. 376:6–23).

[20] *Id.* at 162–163 (pp. 72:23–73:5), 164 (p. 128:19–22), 165–166 (pp. 129:10–130:11), 177 (p. 239:2–22), 181 (p. 250:16–25), 184–185 (pp. 259:24–260:22).

- "**Q. Is making payments through my property tax bill a good idea?**" and answers that question, in part, with the following statement: "If you sell your property, payments may transfer to the new owner, just like your property taxes."

- "How does Ygrene's clean energy financing differ from other options? [...]Key advantages to the program include [that] [t]he project debt does not have to be paid off upon property sale or transfer."[21]

All customer-service representatives were trained on transferability and "were aware of the talking points required for transferability.[22]

The plaintiff's expert is Prentiss Cox, a professor at the University of Minnesota Law School who specializes in consumer protection.[23] He reviewed and summarized Ygrene's marketing materials and identifies (what he characterizes as) consistent misrepresentations that the PACE loans transfer when a borrower sells or refinances a property coupled with no mention of the likelihood of prepayment.[24] He organizes these into four categories: (1) representations that the PACE obligations will transfer; (2) representations that the obligations "may" transfer; (3) "may transfer" representations with a disclosure that "some lenders" require repayment; and (4) "may transfer" representations with a footnote that some lenders require repayment."[25]

In category 1 (the "will transfer" representations), Professor Cox summarizes different marketing and training materials. For example, four versions of a document titled "Ygrene Works" (on a page titled "Ygrene Works for You") ask, "**Q: What are the benefits of making payments on my property tax bill?**," and answer, in part, that payments "stay with the property when you move. . . ."[26] Similarly, a document for contractors titled "Selling Energy Efficiency for Residential Audience to Contractors" has the following statements: (1) under the heading "MESSAGING," it says, "The following set of benefits will likely apply to all residential property

---

[21] Cox Decl. – ECF No. 136-10 at 8–9 (¶¶ 27, 30, 31) (citing Bates Nos. YG-004605, P000825, P000835–P000836, P000841–P000842, and P000895).

[22] Kelly Dep., Ex. 5 to LippSmith Decl. – ECF No. 136-8 at 193–194 (pp. 322:4–323:6), 195 (p. 372:2–5), 196 (p. 374:11–16), 197 (376:6–23).

[23] Cox Decl. – ECF No. 136-10.

[24] *Id.* 19–20 (¶¶ 70–71), 20–21 (¶¶ 74–78), 22 (¶¶ 83–87), 23 (¶¶ 89–93).

[25] *Id.* at 5–14 (¶¶ 13–45).

[26] *Id.* at 5 (¶ 13) (citing Bates Nos. P000503, YG-004637, YG-004639, YG-004673).

United States District Court
Northern District of California

1    owners," and under the subheading "Property Owner Benefits from Ygrene program and

2    financing," it says, "Tax payments stay with the property, so at the time of sale, payments go to

3    the new owner," and (2) "a sample 30-second pitch that includes many of the important reference

4    point" says, "The best part — It doesn't cost you anything up front, and you repay through your

5    property tax bill. That means that if or when you sell your home, you enjoy the 10% higher price

6    due to the work you've done to improve your home, but the tax bill goes to the new owner who

7    enjoys the benefits of the upgrade" and "just like [a] property tax, the payments can stay with the

8    property when you move."[27] In the same vein, a training manual for Ygrene Regional Area

9    Managers and a training document for Ygrene Customer Service Representatives say that the

10   assessment transfers with the property.[28]

11        In category 2 (the "may transfer" representations), Professor Cox summarizes different

12   marketing and training materials. For example, two "Playbooks" for contractors say, "[the] Loan

13   may stay with property upon transfer, especially with Ygrene's SB 555 program, since the

14   assessment is a **Mello-Roos special tax**."[29] A document titled "AMERICA's BEST

15   FINANCING" says, "Lien Transferability – When the Property is Sold, the Lien may be

16   transferred to New Buyers."[30] Another statement in a contractor playbook is that "Financing may

17   be tax deductible and lien may transfer upon sale."[31] A document titled "FREQUENTLY ASKED

18   QUESTIONS PROPERTY OWNERS" has the following Q and A that — by linking the word

19   "may" to a statement about transferability — suggests that the obligation is transferable: (1) Q2:

20   "**How does Ygrene's energy improvement financing differ from other options?**" A (in part):

21

22   [27] *Id.* (¶ 14) (citing Bates Nos. YG-002461, YG-002463).

23   [28] *Id.* at 5–6 (¶¶ 15–16) (citing Bates Nos. YG-002989, YG-003413, YG-003889, YG-002267, YG-
     002281); *see also id.* at 6–7 (¶¶ 17–23) (citations to Bates-numbered documents omitted)
24   (summarizing statements about transferability in Ygrene documents, Ygrene website statements,
     Ygrene sales-presentation documents for account representatives and sales managers, Ygrene program
25   handbooks, documents for Regional Area Managers, a Contractor Playbook, video presentations
     directed to home owners, and mailings to utility customers).

26   [29] *Id.* at 7–8 (¶ 24) (citing Bates Nos. YG-002909, YG-004430, YG-005039) (emphasis in original).

27   [30] *Id.* at 8 (¶ 25) (citing Bates No. YG-002322).

28   [31] *Id.* (¶ 26) (citing Bates No. YG-002629).

"The balance transfers to the new owner upon sale;" and (2) Q7 (on the same page): "**What happens if the property is sold?**" A: "if the property is sold, the remaining payment obligation may be transferred to the new owner."[32] Sales scripts, video presentations aimed at homeowners, website representations, and contractor statements make similar representations to the effect of, if the owner sells the property, the special tax may be transferred.[33]

In category 3 (the "may transfer" representations with a disclosure of the requirements of "some lenders"), Professor Cox summarizes different marketing and training materials that (1) represent that the PACE assessment transfers with sale or refinancing and (2) add that (for example) "some . . . lenders may require full repayment of the special tax upon sale or refinance. Check with your lender to determine their requirements if you are planning to sell or refinance."[34]

In category 4 (the "may transfer" representations with a footnote that some lenders require repayment), Professor Cox summarizes different marketing materials. Some state, "**Q. Is making payments through my property tax bill a good idea?,**" and answer, in part: "If you sell your property, payments may transfer to the new owner, just like your property taxes."[35] A representative footnote says, "Property taxes are legally transferrable on sale[;] however, some mortgage lenders may require full repayment of the special tax upon sale or refinancing."[36] Other materials similarly tout transferability and disclose, in a footnote, that lenders may require prepayment.[37]

The plaintiffs also complain that Ygrene charged a significant prepayment penalty (between three percent and five percent, depending on the jurisdiction) when a borrower repaid a PACE

---

[32] *Id.* (¶ 27) (citing Bates No. YG-004605).

[33] *Id.* at 8–9 (¶¶ 28–32) (citations to Bates-numbered documents omitted).

[34] *Id.* at 10 (¶ 34) (citing Bates Nos. YG-004951–YG-004952,YG-000645); *see also id.* at 10–11 (¶¶ 35–39) (similar representations in training and marketing materials) (citations to Bates-numbered documents omitted).

[35] *Id.* at 12–13 (¶¶ 41(A)–(E)) (citations to Bates-numbered documents omitted).

[36] *Id.* at 13 (¶ 42).

[37] *Id.* at 13–14 (¶¶ 43–45).

United States District Court
Northern District of California

loan before the end of the loan term.[38] (Ygrene stopped imposing the prepayment penalty after the litigation began.[39]) Borrowers who prepaid their loans also had to pay "surprise fees:" (1) a payoff statement fee, which was a fee for a payoff quote of the borrower's cost to prepay a loan; (2) an "administrative fee;" and (3) an escrow/custodial fee.[40]

An issue is the sufficiency of the disclosures about prepayment fees. The plaintiffs contend that the following disclosure does not disclose the prepayment fees, did not define reasonable costs, and did not disclose certain fees for getting a payoff quote:[41]

> Prepayment of Special Tax Obligation. The Owner may prepay the Special Tax obligation at any time by paying the then outstanding principal balance as shown on the amortization schedule provided with the Final Closing Statement, plus reasonable administrative costs and the current year's installment of the Special Tax that appears on the property tax bill. The prepayment may also include a prepayment premium based upon a percentage of the remaining principal as defined in Exhibit C hereto. he Special Tax obligation may only be prepaid in full.[42]

Ygrene has records of the prepayment fees.[43] Ygrene's agent Willdan Financial collected the fees, and the plaintiffs subpoenaed the records and can run calculations to determine damages.[44]

Ygrene's expert is Dominique Hanssens, a professor of marketing at the U.C.L.A. Anderson School of Management.[45] He surveyed 161 Ygrene customers and concluded that there are variations in marketing materials, different statements about transferability, and (generally) input from contractors was the most important source of information that customers considered when deciding to obtain PACE financing from Ygrene.[46]

---

[38] Makowski Dep., Ex. 7 to LippSmith Decl. – ECF No. 136-8 at 224–226 (pp. 86:6–88:4).

[39] *Id.* at 234 (p. 108:13–22).

[40] *Id.* at 220 (pp. 76:5–76:22), 221–223 (pp. 81:19–83:8), 227–230 (pp. 93:5–96:11), 231–232 (pp. 105:19–106:4).

[41] Mot. – ECF No. 136-7 at 13–14.

[42] Look Unanimous Approval Agreement, Ex. 9 to LippSmith Decl. – ECF No. 136-8 at 247.

[43] Bass Decl. – ECF No. 136-9 at 3–4 (¶¶ 4–5).

[44] *Id.* at 4–5 (¶¶ 6–7).

[45] Hanssens Decl. – ECF No. 143-39.

[46] *Id.* at 21–22 (¶¶ 61–65), 29 (¶ 79), 30 (¶ 81).

## 2. The Representative Plaintiffs

As California representatives, the plaintiffs propose Kimberly and Anthony Look, Jr., and as Florida representatives for the three classes, the plaintiffs propose Tammy and George Woolley.[47]

Kimberly and Anthony Look used a Ygrene loan to finance a patio project for their California home in May 2015.[48] They reviewed Ygrene's website and watched a marketing video that told them that loan payments would "stay with the property in the event of a sale or refinancing."[49] They called Ygrene to ask about the program, and they spoke with Megan Smith, who told them that the loan would transfer with the property if they sold the house.[50] In April 2017, when they refinanced their mortgage, the lender would not refinance unless they prepaid the PACE loan.[51] They prepaid the loan (a total of $22,055.91), including (1) a prepayment premium of $638.62, (2) an escrow/custodial fee of $55.00, and (3) an "administrative" fee of $75.00.[52] They would not have taken the PACE loan if they knew that they would have to prepay it in full to refinance or sell their home.[53]

Tammy and George Woolley used a Ygrene loan to finance a home project in December 2015.[54] Mr. Woolley heard about Ygrene from a colleague and later received a Ygrene solicitation

---

[47] Mot. – ECF No. 136-7 at 15.

[48] Kimberly Look Dep., Ex. 1 to LippSmith Decl. – ECF No. 136-8 at 14 (p. 56:2–11), 15–16 (pp. 64:24–65:3).

[49] *Id.* at 18 (p. 68:4–7), 20 (p. 71:9–24), 21–22 (pp. 76:22–77:5), 32 (p. 147:9–14); Anthony Look Dep., Ex. 2 to LippSmith Decl. – ECF No. 136-8 at 47–48 (pp. 67:21–68:1), 49–50 (pp. 69:8–70:1), 55–56 (pp. 143:15–144:1).

[50] Kimberly Look Dep., Ex. 1 to LippSmith Decl. – ECF No. 136-8 at 28 (p. 143:2–20), 30–31 (pp. 145:23–146:1), 32–33 (pp. 146:24–147:19); Anthony Look Dep., Ex. 2 to LippSmith Decl. – ECF No. 136-8 at 51–52 (pp. 93:13–94:2), 53 (p. 101:16–23).

[51] Kimberly Look Dep., Ex. 1 to LippSmith Decl. – ECF No. 136-8 at 36 (p. 167:2–10), 37 (p. 175:22–25); Anthony Look Dep., Ex. 2 to LippSmith Decl. – ECF No. 136-8 at 57 (p. 165:1–14), 58 (p. 169:3–10).

[52] Anthony Look Dep., Ex. 2 to LippSmith Decl. – ECF No. 136-8 at 64–65 (pp. 198:21–199:4); Look Parcel Payoff Statement, Ex. 11 to LippSmith Decl. – ECF No. 136-8 at 310–311.

[53] Kimberly Look Dep., Ex. 1 to LippSmith Decl. – ECF No. 136-8 at 34–35 (pp. 161:24–162:12); Anthony Look Dep., Ex. 2 to LippSmith Decl. – ECF No. 136-8 at 66–67 (pp. 210:16–211:6).

[54] George Woolley Dep., Ex. 3 to LippSmith Decl. – ECF No. 136-8 at 89 (p. 156:5–8), 90 (p. 158:1–11).

letter.[55] The Woolleys reviewed the Ygrene website (listed on the solicitation letter) and watched a marketing video.[56] Both said that the loan obligation would stay with the property in the event of a sale or refinancing.[57] Ms. Woolley called Ygrene to verify the information that she saw on the website, and the representative told her that the PACE loan was transferable and "it was if the house was borrowing the money — not them."[58] Then, in August 2016, the Woolleys applied for a second mortgage with their credit union and were pre-approved (pending inspection and a title search).[59] A loan processor told them that the PACE loan was recorded as a lien and needed to be prepaid before the bank could "proceed with the second mortgage."[60] The Woolleys prepaid the loan (a total of $13,367.60), including (1) a prepayment premium of $668.38, (2) an escrow/custodial fee of $55.00, and (3) an "administrative" fee of $75.00.[61] The Woolleys would not have taken the PACE loan if they had known that they would need to prepay it.[62]

### 3. The Proposed Classes

The plaintiffs propose the following classes:[63]

---

[55] *Id.* at 70–71 (pp. 90:22–91:19), 72–73 (pp. 92:14–93:2), 74–75 (pp. 95:25–96:5); Tammy Woolley Dep., Ex. 4 to LippSmith Decl. – ECF No. 136-8 at 119 (p. 49:2–25), 120 (p. 50:7–13), 121–122 (pp. 52:5–53:5).

[56] George Woolley Dep., Ex. 3 to LippSmith Decl. – ECF No. 136-8 at 77–78 (pp. 109:16–110:6); Tammy Woolley Dep., Ex. 4 to LippSmith Decl. – ECF No. 136-8 at 123–124 (pp. 59:15–60:13).

[57] George Woolley Dep., Ex. 3 to LippSmith Decl. – ECF No. 136-8 at 77–78 (pp. 109:16–110:6), 79 (p. 111:13–20); Tammy Woolley Dep., Ex. 4 to LippSmith Decl. – ECF No. 136-8 at 123–124 (pp. 59:15–60:13), 125 (p. 61:7–10).

[58] Tammy Woolley Dep., Ex. 4 to LippSmith Decl. – ECF No. 136-8 at 126–127 (pp. 63:1–64:19), 128–129 (pp. 65:13–66:9), 131 (p. 89:9–16).

[59] George Woolley Dep., Ex. 3 to LippSmith Decl. – ECF No. 136-8 at 91 (p. 172:11–24).

[60] *Id.* at 93–94 (p. 181:21–182:1), 95 (p. 185:15–21), 96 (p. 187:8–19); Tammy Woolley Dep., Ex. 4 to LippSmith Decl. – ECF No. 136-8 at 132 (p. 109:1–13), 133 (p. 111:5–13), 135 (p. 113:11–19), 136–137 (pp. 114:17–115:4), 138 (p. 117:10–25).

[61] George Woolley Dep., Ex. 3 to LippSmith Decl. – ECF No. 136-8 at 97–98 (pp. 188:17–189:10), 99–100 (190:3–191:1); Tammy Woolley Dep., Ex. 4 to LippSmith Decl. – ECF No. 136-8 at 144 (p. 132:6–16); Woolley Parcel Payoff Statement, Ex. 12 to LippSmith Decl. – ECF No. 136-8 at 312–313.

[62] George Woolley Dep., Ex. 3 to LippSmith Decl. – ECF No. 136-8 at 76 (p. 103:20–121), 108–109 (pp. 244:24–245:4).

[63] Mot. – ECF No. 136-7 at 14–16. Excluded from the proposed classes are "[d]efendants, any entities in which it has a controlling interest, any of its parents, subsidiaries, affiliates, officers, directors,

### 3.1    Prepayment Penalty Classes:

- All persons within the State of California who, during the applicable statute of limitations, entered into a PACE financing agreement originated and/or facilitated by Ygrene in connection with their primary residence who paid a Prepayment Penalty. (Proposed class representatives: Kimberly and Anthony Look, Jr.)

- All persons within the State of Florida who, during the applicable statute of limitations, entered into a PACE financing agreement originated and/or facilitated by Ygrene in connection with their primary residence who paid a Prepayment Penalty. (Proposed class representatives: Tammy and George Woolley).

The claims for the California class members are violations of California's UCL, fraudulent inducement, and negligent misrepresentation.[64] The claims for the Florida class members are a violation of Florida's FDUTPA.[65]

### 3.2    Surprise Fee Classes:

- All persons within the State of California who, during the applicable statute of limitations, entered into a PACE financing agreement originated and/or facilitated by Ygrene in connection with their primary residence who paid an Administrative Fee and/or an Escrow/Custodial Fee in connection with prepayment. (Proposed class representatives: Kimberly and Anthony Look, Jr.)

- All persons within the State of California who, during the applicable statute of limitations, entered into a PACE financing agreement originated and/or facilitated by Ygrene in connection with their primary residence who paid a Payoff Statement Fee. (Proposed class representatives: Kimberly and Anthony Look, Jr.)

- All persons within the State of Florida who, during the applicable statute of limitations, entered into a PACE financing agreement originated and/or facilitated by Ygrene in connection with their primary residence who paid an Administrative Fee and/or an Escrow/Custodial Fee in connection with prepayment. (Proposed class representatives: Tammy and George Woolley.)

- All persons within the State of Florida who, during the applicable statute of limitations, entered into a PACE financing agreement originated and/or facilitated by Ygrene in connection with their primary residence who paid a Payoff Statement Fee. (Proposed class representatives: Tammy and George Woolley.)

---

employees and members of such persons' immediate families, and the presiding judge(s) in this case, their staff, and his, her, or their immediate family."). *Id.* at 15–16 & n.2.

[64] *Id.* at 15.

[65] *Id.*

United States District Court
Northern District of California

The claims for the California class members are violations of California's UCL and tortious interference.[66] The claims for the Florida class members are a violation of Florida's FDUTPA and unjust enrichment.[67]

### 3.3 Equitable Relief Class:

- All persons within the State of California and the state of Florida who, during the applicable statute of limitations, entered into a PACE financing agreement originated and/or facilitated by Ygrene in connection with their primary residence.[68]

## ANALYSIS

Class actions are governed by Federal Rule of Civil Procedure 23. A party seeking to certify a class must prove that all the prerequisites of Rule 23(a) are met, as well as those of at least one subsection of Rule 23(b) (and the relevant subsections here are Rule 23(b)(2) and (3)).

The following are the prerequisites of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

A court may certify a class under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). A court may certify a class under Rule 23(b)(2) for injunctive or declaratory relief (i.e., not for money damages) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2).

"[P]laintiffs wishing to proceed through a class action must actually *prove* — not simply plead — that their proposed class satisfies each requirement of Rule 23, including (if applicable) the

---

[66] *Id.*

[67] *Id.*

[68] *Id.* at 16.

predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014) (emphasis in original) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011); *Comcast Corp. v. Behrend*, 569 U.S. 27, 32–33 (2013)). "[C]ertification is proper only if 'the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23[] have been satisfied.'" *Comcast*, 569 U.S. at 33 (quoting *Wal-Mart*, 564 U.S. at 350–51). "Such an analysis will frequently entail 'overlap with the merits of the plaintiff's underlying claim.'" *Id.* at 33–34 (quoting *Wal-Mart*, 564 U.S. at 351). "That is so because the 'class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.'" *Id.* at 34 (quoting *Wal-Mart*, 564 U.S. at 351). Still, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent — but only to the extent — that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* (citing *Wal-Mart*, 564 U.S. at 351 n.6).

The plaintiffs' claims are predicated on their payment of prepayment of penalties and "surprise" fees in violation of California and Florida laws prohibiting unfair practices and false representations. They move to certify the classes on the ground that Ygrene (and its agents) misrepresented that the loans would attach to their properties (like property taxes) and did not say that that consumers would have to prepay the loans (with penalties) when the homeowners sold or refinanced their homes.[69] The court denies the motion.

### 1. Rule 23(a) Prerequisites

#### 1.1    Numerosity — Rule 23(a)(1)

Rule 23(a)(1) requires a "class so numerous that joinder of all members is impracticable." There is no absolute minimum class size for establishing numerosity, but courts have held that classes as small as 40 satisfy the numerosity requirement. *See, e.g.*, *Twegbe v. Pharmaca Integrative Pharmacy, Inc.*, No. CV 12-5080 CRB, 2013 WL 3802807, at *3 (N.D. Cal. July 17,

---

[69] *Id.* at 7–8.

2013); *In re Lidoderm Antitrust Litig.*, No. 14-md-02521-WHO, 2017 WL 679367, at *13 (N.D. Cal. Feb. 21, 2017) (citing Daniel R. Coquillette et al., 5 Moore's Federal Practice – Civil § 23.22 (2016)). The plaintiffs reasonably estimate a class size that is numerous.[70] Ygrene does not dispute numerosity. The plaintiffs have satisfied Rule 23(a)(1)'s numerosity requirement.

### 1.2    Commonality — Rule 23(a)(2)

Rule 23(a)(2) requires "questions of law or fact common to the class." "What matters to class certification is not the raising of common 'questions' — even in droves — but, rather the capacity of a class-wide proceeding to generate common answers apt to drive the resolution of the litigation." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016) (internal ellipsis and some internal quotation marks omitted) (quoting *Wal-Mart*, 564 U.S. at 350). "To satisfy Rule 23(a)(2) commonality, 'even a single common question will do.'" *Id.* (some internal quotation marks omitted) (quoting *Wal-Mart*, 564 U.S. at 359).

Here, the plaintiffs contend that (1) Ygrene's marketing deceived the Prepayment Penalty class about the transferability of its PACE loans by omitting crucial information about the likelihood and costs of prepayment of PACE loans, and (2) Surprise Fee class members received materially identical disclosures that uniformly failed to inform consumers that they would be assessed prepayment fees, administrative fees, and escrow/custodial fees when they prepaid their loans.[71]

The main issue is whether the plaintiffs have established class-wide exposure and actual reliance.[72] The plaintiffs claim that Ygrene violated the UCL by misrepresenting or omitting the near-likelihood that lenders would require them to repay their PACE loans before they could sell or refinance their home.[73] An essential element for a fraudulent-omission claim is actual reliance. *In re Tobacco II Cases*, 46 Cal. 4th 298 (2009). "To prove reliance on an omission, a plaintiff . . .

---

[70] *Id.* at 19.

[71] *Id.* at 7–8, 20–21; Cox Decl. – ECF No. 136-10 at 4–14 (¶¶ 11–45), 15–19 (¶¶ 50–69), and 22 (¶ 84); Look Unanimous Approval Agreement, Ex. 9 to LippSmith Decl. – ECF No. 136-8 at 245; Woolley Agreement to Pay Assessments, Ex. 10 to LippSmith Decl. – ECF No. 136-8 at 286.

[72] Opp'n – ECF No. 143-23 at 21–24.

[73] *Cold Stone Creamery, Inc. v. Lenora Foods I, LLC*, 332 F. App'x 565 (11th Cir. 2019) ("FDUTPA does not require a plaintiff to prove actual reliance on the alleged conduct.").

United States District Court
Northern District of California

[may] simply prov[e] 'that, had the omitted information been disclosed, one would have been aware of it and behaved differently.'" *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (quoting *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 1093 (1993)). As Ygrene contends, the plaintiffs have not shown class-wide exposure and actual reliance because they put in no evidence that any homeowner saw the marketing materials that their expert summarizes.[74]

*Todd v. Tempur-Sealy Int'l, Inc.*, a misrepresentation case, supports the conclusion that even an extensive advertising campaign does not support the inference of classwide exposure. *See* No. 13-cv-04984-JST, 2016 WL 5746364 (N.D. Cal. Sept. 30, 2016).[75] *Todd* was a class action that challenged Tempur-Sealy's marketing of its mattresses, pillows, and bedding products as (for example) "formaldehyde free" and "hypoallergenic." *Id.* at *1. In analyzing commonality and predominance, the court held that the plaintiffs failed to demonstrate that the marketing was sufficiently extensive to allow an inference of class-wide disclosure, in part because the plaintiffs did not identify (1) what representations led to "consumer impressions," (2) what statements were the direct mailings to consumers, (3) what portion of customer-service calls were related to complaints about chemicals or emissions, and (4) whether there was a uniform response to customer complaints about gasses or chemicals. *Id.* at *11. Even more fundamentally, it could not be assumed that consumers bought products based on marketing representations (as opposed to simply relying on impressions while shopping), and there was no evidence that the third-party retailers who sold the products implemented the defendants' alleged uniform marketing campaign. *Id.* at *12. In sum, the *Todd* plaintiffs did not establish their exposure to the marketing campaign or that the campaign had uniform misrepresentations. *Id.*

Like the plaintiffs in *Todd*, the plaintiffs here have not established class-wide exposure or actual reliance. There is no evidence of a marketing campaign that even approximates the *Todd* campaign. The record suggests that any direct-mailing campaign was modest. The contractors sold

---

[74] Cox Decl. – ECF No. 136-10 at 3–14 (¶¶ 10–45), 6–7 (¶¶ 21, 24, 26).

[75] Opp'n – ECF No. 143-23 at 23–24 (citing *Todd*, 2016 WL 5746364, at *11–12).

United States District Court
Northern District of California

the product, and there is no evidence that they implemented a sales pitch that establishes the requisite exposure needed for class certification.

*Mazza v. Am. Honda Motor Co., Inc.* also supports the conclusion that the plaintiffs have not established reliance. 666 F.3d 581 (9th Cir. 2012). *Mazza* involved the plaintiffs' exposure to a limited advertising campaign about a braking package for certain Honda Acuras. *Id.* at 585–86, 594–96. The court held that the small scale of the advertising campaign did not support a presumption of reliance.

Ygrene also contends that its marketing representations were not uniform, predicating this contention on its contractors' declarations that they tailored their pitches to the needs of a particular property owner.[76] This does not necessarily defeat commonality (or typicality or predominance). If there were representations — made as a major selling point that the PACE loans transfer with the property and are not like a loan at all — then slight variations in wording would not defeat the uniform misrepresentation.[77] *See In re First Alliance Mortg.*, 471 F.3d at 991 ("[T]he gravamen of the alleged fraud is not limited to the specific misrepresentations made to bond purchasers. . . . The exact wording of the oral misrepresentations, therefore, is not the predominant issue. It is the underlying scheme which demands attention.") (citation omitted). Put another way, slight variations in wording do not matter if the gist of the representation is the same: the PACE loans are transferrable. But again, there is no evidence of uniform representations or class-wide exposure or reliance.

Ygrene next contends that its contracts disclosed the issue sufficiently to the consumers, and that in any event, the disclosures are not uniform.[78] This is an important point. Some documents mention potential limits on transferability,[79] and others assert (without reservation) that Ygrene's

---

[76] *Id.* at 25–26 (citing Contractor Decls., Exs. N–R to Levin Decl. – ECF Nos. 143-29–143-33).

[77] Cox Decl. – ECF No. 136-10 at 5–6 (¶¶ 15, 16.B), 8–9 (¶¶ 25, 29), 11 (¶ 36).

[78] *Id.* at 26–27. Ygrene's fact submissions do not permit the court to determine whether its contract-based arguments are correct..

[79] *See, e.g.,* Distinct Transferability Statements, Ex. 2 to Hanssens Decl. – ECF No. 143-39 at 112–13 ("Ygrene payments are made through property taxes which are legally transferable upon sale; however, mortgage lenders may require full repayment of the special tax upon sale or refinance;" "YgreneWorks PACE financing payments are incorporated into and repaid as part of the property

PACE loans are transferable and do not have to be paid off in the event of a sale.[80] In the former category, this may defeat Ygrene's liability if the disclosures adequately disclose the risk of prepayment and fees. In its review of one financing agreement, the court agreed that the agreement adequately disclosed the possibility of prepayment and a prepayment-waiver fee.[81] Either way, common disclosures are common questions that result in common answers. The same is true about the contracts' disclosures about prepayment and the attendant fees and costs (such as the disclosure excerpted in the Statement).

That said, there are hundreds of contracts. There must be some uniformity in the contracts that would allow a class action to proceed based on uniform representations in the contracts, but the proposed class definitions are too broad and untethered to the representations. Revised class definitions might solve this problem.

Ygrene also contends that even if there were a misrepresentation, the court cannot assume that it was material.[82] Its survey shows that only three percent of customers considered transferability important in deciding to take a PACE loan, and "no Ygrene customers considered the reasonableness of the fees and penalties associated with prepayment important."[83] The plaintiffs object to the sufficiency of that survey and contend the transferability was a key marketing point.[84] Given the court's conclusions about class-wide exposure and reliance, the court does not reach the issue.

_____

owners' property taxes which are legally transferable upon sale; however, some mortgage lenders may require full repayment of the special tax;" "Some banks and/or purchasers require the outstanding assessment balance to be paid off when a homeowner refinances or sells a home, which can be done without pre-payment penalties if seller purchased a pre-payment waiver at the time of financing. upon sale or refinancing;" and "Property taxes are legally transferable at the time of sale; however individual transactions vary and may limit transferability.").

[80] *See id.* ("Transferable: Yes"; "Transferability: As part of property taxes; "The project debt does not have to be paid off upon property sale or transfer.").

[81] Order – ECF No. 52 at 9–10, 12–14.

[82] Opp'n – ECF No. 143–23 at 28.

[83] *Id.* at 28 (citing Hanssens Decl. – ECF No. 143-39 at 9–10 (¶ 25), 41–44 (¶¶ 112–116)).

[84] Mot. to Strike Hanssens Decl. – ECF No. 155-5.; Reply – ECF No. 158-4 at 14;.

United States District Court
Northern District of California

1    Ygrene also contends that the contract's disclosure — that consumers would be required to

2    pay a "reasonable" administrative fee — defeats certification because "reasonableness" inquiries

3    involve individualized issues that predominate.[85] To support its argument, it cites cases involving

4    health-care costs.[86] *See, e.g., Ross-Randolph v. Allstate Ins. Co.*, No. DKC 99-3344, 2001 WL

5    36042162, at *6 (D. Md. May 11, 2001) (collecting cases); *Colomar v. Mercy Hosp., Inc.*, 242

6    F.R.D. 671, 680–81 (S.D. Fla. 2007); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524–25

7    (5th Cir. 2007).[87] As the plaintiffs point out, health care is highly individualized, and evaluating

8    reasonableness on a class basis is difficult because the inquiry involves "determin[ing] whether a

9    particular medical provider's procedure was necessary for a claimant." *Ross-Randolph*, 2001 WL

10    36042162, at *6.[88] By contrast, this case involves whether Ygrene is permitted to assess an

11    undisclosed fee. The plaintiffs point out that courts certify cases involving undisclosed fees. *Ehret*

12    *v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 899 (N.D. Cal. 2015) (certifying surprise-fee case).[89]

13    The court defers its analysis of the issue to any renewed motion for class certification.

14    Ygrene also contends that the plaintiffs' damages model fails because it does not account for

15    consumers who prepaid for reasons other than sale or refinancing.[90] But relief under the UCL

16    focuses on the defendant's conduct, rather than the plaintiff's damages, in service of the statute's

17    larger purpose of protecting the general public against unscrupulous business practices. *In re*

18    *Tobacco II Cases*, 46 Cal. 4th at 312. That is why under the UCL, restitution is available without a

19    more particularized proof of injury and causation. *See Stearns v. Ticketmaster Corp.*, 655 F.3d

20    1013, 1021 (9th Cir. 2011).[91] And the named plaintiffs arguably here have shown the appropriate

21

22    [85] Opp'n – ECF No. 143-23 at 29.

23    [86] *Id.* at 29–30.

     [87] *Id.* (citing these cases).

24    [88] Reply – ECF No. 158-4 at 18 (quoting *Ross-Randolph*, 2001 WL 36042162, at *6).

25    [89] *Id.* (citing *Ehret*, 148 F. Supp. 3d at 899, and *Bowe v. Pub. Storage*, 318 F.R.D. 160, 180 (S.D. Fla. 2015)).

26    [90] Reply – ECF No. 159-4 at 31.

27    [91] The parties did not address in depth whether the FDUTPA analysis is similar to the UCL analysis, but on their (modest) briefing (a half page each), the analysis is similar.

28

individual-specific factors, such as injury-in-fact and causation. *Id.* at 1020. Also, the PACE loans here are tethered to specific transactions. The Bass declaration sufficiently establishes a damages model for calculating individualized damages.[92] *Leyva v. Medline Indus., Inc.*, 716 F.3d 510, 514 (9th Cir. 2013). Moreover, different damages do not destroy class cohesion. *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1167–68 (9th Cir. 2014).

### 1.3   Typicality — Rule 23(a)(3)

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "The test of typicality serves to ensure that 'the interest of the named representative aligns with the interests of the class.'" *Torres*, 835 F.3d at 1141 (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "'Under the Rule's permissive standards, representative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'" *Id.* (quoting *Parsons v. Ryan*, 754 F.3d 657, 685 (9th Cir. 2014)). "In this context, 'typicality refers to the nature of the claim or defense and not to the specific facts from which it arose or the relief sought.'" *Id.* (internal ellipsis omitted) (quoting *Parsons*, 754 F.3d at 685). "Measures of typicality include 'whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct.'" *Id.* (quoting *Hanon*, 976 F.2d at 508). "Typicality is satisfied 'when each

---

[92] Ygrene moved to strike the Bass declaration. Mot. to Strike Bass Decl. – ECF No. 143-141. The court denies the motion. Under *Comcast*, the court must vet the proposed damages model with some rigor. *Comcast*, 569 U.S. at 35–36. The court has tried to do that. The expert's calculations will assist the trier of fact given, among other things, the class size and the varying (yet ascertainable) fees. The model is consistent with the plaintiffs' theory of liability.

Ygrene moved to strike the Cox declaration on the grounds that (1) he is unqualified to opine on consumer perceptions, (2) he opines (impermissibly) about legal conclusions, (3) his methodology is unreliable, and (4) his opinions are irrelevant. Mot. to Strike Cox Decl. – ECF No. 143-40. The court denies the motion. Professor Cox opines as a real-estate and mortgage expert, his opinions are based on his personal knowledge and experience, and — at class certification — the primary utility of his declaration (as the discussion in this order shows) is his organization of the evidence.

The plaintiffs moved to strike Professor Hanssens's declaration. Mot. to Strike Hanssens Decl. – ECF No. 155-5. The court denies the motion. The objections go to credibility, weight, and context, *see Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2016 WL 1743116, at *6 (N.D. Cal. May 2, 2016), and the declaration in any event did not alter the analysis here.

United States District Court
Northern District of California

class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability." *Arroyo v. Int'l Paper Co.*, No. 17-cv-06211-BLF, 2019 WL 1508457, at *6 (quoting *Rodriguez v. Hayes*, 591 F.3d 1105, 1124 (9th Cir. 2010)).

The court's analysis of commonality means that the named plaintiffs' claims are not typical of the classes' claims.

### 1.4    Adequacy – Rule 23(a)(4)

Rule 23(a)(4) requires that "the representative parties [] fairly and adequately protect the interests of the class." "This adequacy requirement . . . 'serves to uncover conflicts of interest between named parties and the class they seek to represent' as well as the 'competency and conflicts of class counsel.'" *Espinosa v. Ahearn (In re Hyundai and Kia Fuel Econ. Litig.)*, 926 F.3d 539, 566 (9th Cir. 2019) (en banc) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 626 n.20 (1997)). "To determine legal adequacy, [courts] resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?'" *Id.* (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).

There are no conflicts. The plaintiffs maintain that they will prosecute the case vigorously through qualified counsel on behalf of the class.[93] They have actively participated in the case, cooperated in discovery, and completed their depositions.[94]

Class counsel is adequate in all relevant respects. Under Rule 23(g)(1)(A), the court considers the following criteria: (1) counsel's work in identifying and investigating potential claims in the action; (2) counsel's experience in handling class actions; (3) counsel's knowledge of the

---

[93] Mot. – ECF No. 136-7 at 23; Kimberly Look Dep., Ex. 1 to LippSmith Decl. – ECF No. 136-8 at 23–24 (pp. 101:6–102:1), 24–25 (pp. 102:24–103:3); Anthony Look Dep., Ex. 2 to LippSmith Decl. – ECF No. 136-8 at 59–60 (pp. 179:21–180:8), 60–61 (pp. 180:22–181:17), 62 (p. 185:3–19), 63 (p. 187:3–15); George Woolley Dep., Ex. 3 to LippSmith Decl. – ECF No. 136-8 at 110–111 (pp. 248:16–249:15), 112 (p. 250:3–21), 115 (p. 259:13–18); Tammy Woolley Dep., Ex. 4 to LippSmith Decl. – ECF No. 136-8 at 154 (p. 172:12–23), 155 (p. 177:3–13).

[94] *Id.*

United States District Court
Northern District of California

particular law; and (4) the resources that counsel will commit to representing the class. Fed. R.

Civ. P. 23(g)(1)(A). The court also "considers any other matter pertinent to counsel's ability to

fairly and adequately represent the class." Fed. R. Civ. P. 23(g)(1)(B). Counsel have extensive

experience in litigating class actions, they are proficient in the applicable law, and they have the

necessary resources to prosecute this action to the end.[95]

## 2.  Rule 23(b) Prerequisites

### 2.1    Predominance — Rule 23(b)(3)

Among other things, Rule 23(b)(3) requires that "the questions of law or fact common to class

members predominate over any questions affecting only individual members." "Considering

whether 'questions of law or fact common to class members predominate' begins with . . . the

elements of the underlying cause of action." *Halliburton*, 563 U.S. at 809.

The predominance inquiry involves weighing and evaluating the common and individual

issues in the case. *Wal-Mart*, 564 U.S. at 360–61. The "inquiry tests whether the proposed classes

are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc. v.

Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quotation omitted). A common question "is one where

the same evidence will suffice for each member to make a prima facie showing [or] the issue is

susceptible to generalized, class-wide proof." *Id.* (internal quotation marks omitted). An individual

question is "one where members of a proposed class will need to present evidence that varies from

member to member. . . ." *Id.* (internal quotation marks omitted). The predominance inquiry

involves the same principles that guide the Rule 23(a)(2) commonality analysis, but it "is even

more demanding than Rule 23(a)." *Comcast*, 569 U.S. at 34.

Because there is no commonality, there is no predominance.

### 2.2    Superiority — Rule 23(b)(3)

Rule 23(b)(3) requires a class proponent to show that the class action is the superior method

for adjudicating the dispute. Factors to be considered in weighing this question include the

---

[95] *See* Kaliel Decl. – ECF No. 137-5 at 2–5 (¶¶ 2–19); LippSmith Decl. – 136-8 at 2–9 (¶¶ 2–15).

United States District Court
Northern District of California

1    following: (1) class members' interest in individually controlling the litigation; (2) the extent and

2    nature of the litigation; (3) the desirability of concentrating the claims in one suit; and (4) the

3    likely difficulties in managing the class action. Fed. R. Civ. P. 23(b)(3)(A)–(D); *Leyva*, 716 F.3d

4    at 514. If the plaintiffs had established commonality and predominance, then a class action would

5    be superior to individual suits. The stakes for individual members are low, and litigation costs

6    would exceed the value of individual litigation.[96]

### 2.3    Acting on Grounds That Apply Generally to the Class — Rule 23(b)(2)

8        A court may certify a class under Rule 23(b)(2) if "the party opposing the class has acted or

9    refused to act on grounds that apply generally to the class, so that final injunctive relief or

10   corresponding declaratory relief is appropriate respecting the class as a whole[.]"

11       "'The key to the (b)(2) class is the 'indivisible nature of the injunctive or declaratory remedy

12   warranted — the notion that the conduct is such that it can be enjoined or declared unlawful only

13   as to all of the class members or as to none of them.'" *B.K. ex rel. Tinsley v. Snyder*, 922 F.3d 957,

14   971 (9th Cir. 2019) (quoting *Wal-Mart*, 564 U.S. at 360). "'In other words, Rule 23(b)(2) applies

15   only when a single injunction or declaratory judgment would provide relief to each member of the

16   class. It does not authorize class certification when each individual class member would be

17   entitled to a different injunction.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 360).

18       Rule 23(b)(2) "does not require [courts] to examine the viability or bases of class members'

19   claims for declaratory and injunctive relief, but only to look at whether class members seek

20   uniform relief from a practice applicable to all of them." *Rodriguez v. Hayes*, 591 F.3d 1105, 1125

21   (9th Cir. 2010). "'[I]t is sufficient' to meet the requirements of Rule 23(b)(2) that 'class members

22   complain of a pattern or practice that is generally applicable to the class as a whole.'" *Id.* (quoting

23   *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir. 1998)). "The fact that some class members may

24   have suffered no injury or different injuries from the challenged practice does not prevent the class

25   from meeting the requirements of Rule 23(b)(2)." *Id.* (citing *Walters*, 145 F.3d at 1047).

26   "Furthermore, unlike actions brought under one of the other 23(b) prongs, 'questions of

27

28   _____

[96] Mot. – ECF No. 136-7 at 30.

manageability and judicial economy are irrelevant to 23(b)(2) class actions.'" *Id.* (internal ellipsis omitted) (quoting *Forbush v. J.C. Penney Co., Inc.*, 994 F.2d 1101, 1105 (5th Cir. 1993)).

The Ninth Circuit has recently instructed that courts should not impose a "cohesiveness" requirement in assessing whether certification under Rule 23(b)(2) is appropriate. *Senne v. Kan. City Royals Baseball Corp.*, 934 F.3d 918, 937–38 (9th Cir. 2019) (internal brackets omitted) (quoting Fed. R. Civ. P. 23(b)(2)). "Although common issues must predominate for class certification under Rule 23(b)(3), no such requirement exists under 23(b)(2)." *Id.* at 938 (quoting *Walters*, 145 F.3d at 1047). Instead, "Rule 23(b)(2) . . . requires only that 'the party opposing the class have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.'" *Id.* at 928 (internal brackets omitted) (quoting Fed. R. Civ. P. 23(b)(2)). Due to Rule 23(b)(2)'s and Rule 23(b)(3)'s differing requirements, courts have granted motions to certify putative classes under Rule 23(b)(2) while denying motions to certify the classes under Rule 23(b)(3). *See, e.g.*, *Ang v. Bimbo Bakeries USA, Inc.*, No. 13-cv-01196-HSG, 2018 WL 4181896, at *12, *17 (N.D. Cal. Aug. 31, 2018) (denying certification under Rule 23(b)(3) "[b]ecause Plaintiffs have not shown that the economic harm they allegedly sustained . . . is capable of measurement on a classwide basis" but granting certification under Rule 23(b)(2) because "a single injunction would provide relief to each member of the class") (internal ellipsis omitted); *Campbell v. Facebook Inc.*, 315 F.R.D. 250, 269–70 (N.D. Cal. 2016) (same).

The plaintiffs here seek a single injunction or declaratory judgment — namely, an injunction preventing Ygrene from charging prepayment penalties or unauthorized administrative fees and requiring it to provide adequate disclosures — that would provide relief to each member of the class.[97] If the plaintiffs had established commonality and predominance on the theories that they advanced, then they would have satisfied the requirement for certifying a class under Rule 23(b)(2). *Cf. In re Qualcomm*, 328 F.R.D. at 318–19 (certifying Rule 23(b)(2) class in antitrust

---

[97] Second Amend. Compl. – ECF No. 44 at 52. The plaintiffs do not need to specify at the class-certification stage the precise injunction they will ultimately seek on the merits. *B.K.*, 922 F.3d at 972.

case); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 595–97 (N.D. Cal. 2010) (same).

## CONCLUSION

The court denies the motion to certify the proposed classes. The court denies the motions to strike the expert submissions.

The parties must confer on a new case schedule.

This disposes of ECF Nos. 137, 145, 146, and 157.

**IT IS SO ORDERED.**

Dated: May 28, 2020

_____

LAUREL BEELER
United States Magistrate Judge